KAREN COHEN KINNETT

VERSUS

JARRED BRANDON KINNETT

NO. 17-CA-625

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 768-195, DIVISION "E"
HONORABLE JOHN J. MOLAISON, JR., JUDGE PRESIDING

August 06, 2020

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Robert A. Chaisson

**REVERSED AND REMANDED.**
  **FHW**
  **JGG**
  **RAC**

**WICKER, J.; CONCURS WITH REASONS**
  **FHW**

COUNSEL FOR PLAINTIFF/APPELLEE,
KAREN COHEN KINNETT
    Allison K. Nestor
    Leonard L. Levenson

COUNSEL FOR DEFENDANT/APPELLEE,
JARRED BRANDON KINNETT
    Jacqueline F. Maloney
    Tracy G. Sheppard

COUNSEL FOR INTERVENOR/APPELLANT,
KEITH EDWARD ANDREWS
    Thomas A. Robichaux
    Stephanie A. Fratello
    Sharon L. Andrews
    Desiree M. Valenti

COUNSEL FOR MINOR/APPELLEE,
G. J. K., MINOR CHILD
    Ramona G. Fernandez, Supervising Attorney
    Loyola University New Orleans, College of Law
    Lindsay Dean, Student Practitioner
    Ashley Fisher, Student Practitioner
    Elizabeth Fox, Student Practitioner

COUNSEL FOR AMICUS CURIAE,
STATE OF LOUISIANA, DEPARTMENT OF JUSTICE
    Honorable Jeffrey M. Landry
    David J. Smith, Jr.
    Jeffrey M. Wale

**WICKER, J.**

DNA evidence establishes a 99.99% probability that Appellant, Keith Andrews, is the biological father of the minor child G.J.K. Mr. Andrews intervened in divorce proceedings between Appellee, Karen Cohen Kinnett, the child's mother, and her husband, Appellee Jared Brandon Kinnett, to file an avowal action to establish the paternity of G.J.K. on February 10, 2017. At the time, G.J.K. was eighteen months old. Mr. Andrews appeals the judgment of the trial court sustaining Mr. Kinnett's exception of prescription or peremption, resulting in a dismissal of Mr. Andrews' petition to establish paternity.

On March 23, 2018, this Court stayed this appeal and remanded the matter to the trial court to afford the parties the opportunity to properly address the constitutionality of Louisiana Civil Code art. 198 as raised by both Mr. Andrews and the Stuart H. Smith Law Clinic at Loyola Law School ("Law Clinic"), representing the child's interests. On remand, the trial court found that Mr. Andrews failed to meet his burden of proving the statute unconstitutional. Therefore, Mr. Andrews also appeals the trial court's January 10, 2019 judgment excluding his evidence on constitutionality and finding Louisiana Civil Code art. 198 to be constitutional.

For the reasons elucidated below, we find that the trial judge erred in his June 2, 2017 judgment finding that the avowal action was perempted. Therefore, we reverse the June 2, 2017 judgment of the trial court and remand this matter to the trial court for further proceedings consistent with this opinion. As we have resolved this case based upon our interpretation of Louisiana Civil Code art. 198, we decline to address the statute's constitutionality.

17-CA-625                                     1

# FACTS[1]

Karen and Brandon Kinnett were married on January 24, 2009. On August 29, 2011, their daughter, B.A.K., was born. Thereafter, beginning in the late summer or fall of 2013, Ms. Kinnett engaged in an extramarital affair with Mr. Andrews. Mr. Andrews testified that the relationship consisted mostly of infrequent sexual encounters for several reasons. First, although Ms. Kinnett expressed unhappiness with her marriage, telling Mr. Andrews that she slept in her daughter's bedroom instead of with her husband, she was reluctant to leave the marriage.[2] Second, Mr. Andrews was preoccupied with opening a restaurant while simultaneously maintaining his solo law practice at the time the affair began. Finally, the necessity of keeping the relationship a secret combined with both parties' busy schedules made meeting on a regular basis difficult.

Furthermore, soon after the affair with Ms. Kinnett began, Mr. Andrews started dating another woman and suggested to Ms. Kinnett that they end their affair. According to Mr. Andrews' testimony, Ms. Kinnett did not want to end their relationship, but the already infrequent encounters became even more sporadic, occurring only once every two or three months.

The last intimate encounter between Mr. Andrews and Ms. Kinnett occurred on November 15, 2014. Mr. Andrews testified that the NuvaRing® birth control device Ms. Kinnett used throughout their relationship was present during the encounter. Ms. Kinnett testified to having ten years' experience using that birth control method.

With the exception of two text messages between Ms. Kinnett and Mr. Andrews five days later, the parties did not communicate thereafter for over five

---

[1] These facts are based upon the testimony given at the June 2, 2017 hearing before the district court. Mr. Kinnett called Mr. Andrews, and thereafter, Mr. Andrews called Ms. Kinnett to give testimony.

[2] According to Mr. Andrews' testimony, Ms. Kinnett was waiting for a more stable job situation before taking steps to end her marriage.

months, until May 7, 2015.  Ms. Kinnett was pregnant in May and testified that she knew then that Mr. Andrews was possibly her child's father.  She did not, however, tell Mr. Andrews then that she was pregnant or that he might be the father.  G.J.K. was born on August 5, 2015.  Mr. Andrews testified that he made several attempts to contact Ms. Kinnett via text message in the months between November 2014 and September 1, 2015, without response.

On September 1, 2015, Mr. Andrews tried texting Ms. Kinnett again, and she responded.  He testified that she apologized for not answering his texts and explained that she had had sexual relations with her husband one night, had gotten pregnant, and had had a baby "with" her husband.  She further explained that she was staying in her marriage for the sake of the children.  Mr. Andrews testified that, during the September 1st conversation, it crossed his mind that he could be the child's father, but he testified further that, at that point, he did not recall the date of his last sexual encounter with Ms. Kinnett.  During that communication, Ms. Kinnett did not tell Mr. Andrews when G.J.K. had been born or how old he was then.  Ms. Kinnett, while initially testifying, "I told him it was my husband's child," eventually restated, "I think the message was that I had had a baby and that I was trying to work on my marriage."[3]  She also testified that she believed her husband was her child's father, and that her belief was confirmed when the baby was born looking exactly like Mr. Kinnett.

After the September 1, 2015 text exchange, communication between Mr. Andrews and Ms. Kinnett was limited to occasional texts as friends.[4]  Fifteen months later, on December 9, 2016, Ms. Kinnett called Mr. Andrews by phone.

---

[3] Mr. Andrews' attorney confronted Ms. Kinnett with her prior testimony before the Domestic Commissioner on April 12, 2017, wherein she initially testified that she told Mr. Andrews that her husband was the child's father, but on further questioning declared, "[a]ctually, I don't even recall if I—I think the message was that I had had a child and that I was trying to work on my marriage."

[4] Mr. Andrews testified that the only time he saw Ms. Kinnett in person between the date of their last sexual encounter and December 10, 2016, was about three weeks before she called to tell him he was G.J.K.'s father.  He ran into Ms. Kinnett with her mother and two children at the Starbucks near his home and exchanged a brief greeting.

During that conversation, she informed him that she had performed a sibling DNA test on her two children and learned that Mr. Kinnett was not G.J.K.'s biological father.

After hanging up, Ms. Kinnett immediately texted Mr. Andrews photographs of G.J.K. and wished him "Happy Father's Day." The two texted throughout that evening and into early the next morning. In one text Ms. Kinnett stated, "I'll never be able to ask your forgiveness enough. He's a precious guy. He's lucked out with you."

Ms. Kinnett testified that she conducted the sibling paternity test to "prove to Brandon that it was his child" after he remarked that he did not think G.J.K. looked like him.[5] She also alleged that when she informed Mr. Andrews of his paternity, he told her that he had suspected that the child was his since first learning of the birth.

On December 10, 2016, Mr. Andrews met Ms. Kinnett and G.J.K. at a testing facility for a DNA paternity test. She called him thereafter on December 14th, to inform him that the test confirmed his biological paternity of G.J.K. On January 12, 2017, she informed Mr. Kinnett that he was not G.J.K.'s biological father, and on January 14, 2017, she filed for divorce. On January 30, 2017, Mr. Andrews, Ms. Kinnett, and G.J.K. all submitted for an additional DNA test. The February 2, 2017 results confirmed that Mr. Andrews is the child's biological father to a scientific certainty of 99.999999998%. Mr. Andrews attached a copy of the January 30th test results to his avowal petition filed eight days later on February 10, 2017.

---

[5] Mr. Kinnett gave no indication to the court that he harbored suspicions about G.J.K.'s paternity prior to January of 2017.

## PROCEDURAL HISTORY

Ms. Kinnett commenced the instant litigation by filing for divorce on January 14, 2017. She sought joint custody with Mr. Kinnett of their daughter, B.A.K., but sole custody of her son, G.J.K. On January 27, 2017, Mr. Kinnett filed his Answer and Reconventional Demand disputing Ms. Kinnett's contention that awarding her sole custody of G.J.K. would be in the child's best interest, urging instead that joint custody be granted.

On February 10, 2017, Mr. Andrews filed a Petition in Intervention to Establish Paternity and to Obtain Custody of G.J.K. In his petition, Mr. Andrews alleged that Ms. Kinnett had concealed his possible paternity until December 9, 2016, and sought an order establishing paternity and an action to obtain custody.

On February 21, 2017, Mr. Kinnett answered Mr. Andrews' intervention with Exceptions of No Cause and/or No Right of Action, Prescription, and Peremption, arguing that Mr. Andrews' avowal action was perempted under Louisiana Civil Code art. 198 because he failed to file an action within one year of G.J.K.'s birth. On February 24, 2017, the court appointed the Loyola Law Clinic to represent the interests of the minor child. Ms. Kinnett first filed a memorandum opposing the exceptions on April 10, 2017, however, on May 31, 2017, she filed a second memorandum supporting the exceptions. On appeal, Ms. Kinnett adopted the arguments in Mr. Kinnett's appellee briefs.

At the initial April 12, 2017 hearing, the Domestic Commissioner denied the exceptions of no right of action and no cause of action as to paternity, and granted the exception of no cause of action as to custody. He also granted the exception of peremption, finding that Mr. Andrews should have known G.J.K. was his child given that he had "intimate contact" with Ms. Kinnett nine months prior to the child's birth. Mr. Andrews objected to the Commissioner's ruling, contending in

17-CA-625                                          5

pertinent part that the "time limitations in Civil Code article 198 are constitutionally invalid."

The parties tried the exceptions *de novo* before the district court on June 2, 2017. The district court judge ruled from the bench denying the exceptions of no cause of action and no right of action as to paternity, but granting the exceptions of no cause of action and no right of action as to custody and visitation. The judge further held that Mr. Andrews' avowal action was perempted under Article 198 based on his finding that (a) Mr. Andrews had not proven "that the mother was actually in bad faith and intended to deceive," and (b) he had filed his avowal action more than a year from the time the judge determined he knew or should have known that he was G.J.K.'s father. The trial court declined to rule on the constitutionality of the statute and denied Mr. Andrews' motion for additional time to notify the attorney general and further plead the constitutionality issue. Mr. Andrews appealed the June 2, 2017 judgment to this Court.

On March 23, 2018, this Court stayed this appeal and remanded the case to the trial court to allow Mr. Andrews the opportunity to amend his petition and appropriately challenge the constitutionality of Article 198. *Kinnett v. Kinnett*, 17-CA-625, *per curiam*, p. 4. On April 6, 2018, Mr. Andrews filed his First Supplemental and Amending Petition, formally challenging Article 198's constitutionality, thereafter notifying the Louisiana Attorney General as required by law. The Law Clinic filed a memorandum in support of Mr. Andrews' Supplemental and Amending Petition on June 4, 2018.

The hearing on the constitutional challenge was initially set for June 13, 2018. However, a volley of motions prompted a continuance to address the issues raised by the parties. On May 12, 2018, Mr. Kinnett moved to strike the portions of Mr. Andrews' petition in which he alleged that he had provided financial support and started spending time with G.J.K. after December 9, 2016, on the

grounds that whether the biological father had established a relationship with the child was not relevant to the question of constitutionality. Ms. Kinnett filed a motion *in limine* to prevent Mr. Andrews from testifying or presenting evidence of the same at the constitutionality hearing. Mr. Kinnett also filed a motion *in limine* to prevent Mr. Andrews from presenting expert testimony and evidence, arguing that only briefs and arguments were appropriate.[6]

On October 16, 2018, the court granted both motions *in limine*. While the trial court recognized the possibility that "constitutional scholars, legislators, or those who possess highly specialized knowledge of the legislative history of the law in question" might serve as witnesses, the court found that neither the opinion of Dr. Sonnier nor the testimony of Mr. Andrews was related to "whether the statute serves a legitimate government purpose of protecting the status of a child vis-á-vis his mother and father, his family, his classmates, and the world."[7]

On November 5, and December 18, 2018, the district court heard arguments on the constitutionality of Article 198. The Hon. William C. Credo, III, presided as judge *pro tempore*.[8] On January 10, 2019, the court issued its written judgment, holding "that La. Civ. Code art. 198 is constitutional… Keith Edward Andrews failed to submit evidence that Article 198 violates either substantive or procedural rights to due process or that it fails to protect a fundamental liberty interest, as alleged in his First Supplemental and Amending Petition." On June 12, 2019, this Court lifted the stay on the appeal and set deadlines for the parties to file supplemental briefs solely on the issue of Article 198's constitutionality.

---

[6] Mr. Andrews' expert witness, Dr. Loretta Sonnier, is a board-certified forensic child and adolescent psychiatrist. In her expert report, Dr. Sonnier expressed the opinion that "the application of Article 198 in GJK's case is more likely to cause him harm than prevent harm."

[7] Although Mr. Andrews asserted that Dr. Sonnier's expertise in the science of child development would "aid the court in determining whether the law works to protect children," the court denied the need for such testimony stating, "the issue is not whether the statute works or is drawn with child development science in mind."

[8] In August of 2018, Judge John Molaison was elected to this Court. The Louisiana Supreme Court thereafter appointed Mr. William C. Credo, III to the district court bench until the election of Judge Molaison's successor.

On appeal, Mr. Andrews argues (1) that the trial court erred in its interpretation and application of Article 198, and (2) that the statute itself is unconstitutional both on its face and as applied. It is well settled that courts should avoid addressing constitutional questions when a case can be disposed of on non-constitutional grounds. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371 (La. 7/1/08), 998 So.2d 16, 25, *amended on reh'g* (9/19/08); *Crown Beverage Co. v. Dixie Brewing Co., Inc.*, 96-2103 (La. App. 4 Cir. 5/28/97), 695 So.2d 1090, 1093, *writ denied*, 97-1711 (La. 10/13/97), 703 So.2d 615; *Bize v. Larvadain*, 18-394 (La. App. 3 Cir. 12/28/18), 263 So.3d 584, 592 (citing *State v. Lanclos*, 07-0082 (La. 4/8/08), 980 So.2d 643, 647-48), *reh'g denied* (2/13/19), *writ denied*, 19-0419 (La. 5/6/19), 270 So.3d 577. Likewise, statutes are presumed constitutional, and when the interpretation of a statute is at issue, this Court "must construe a statute so as to preserve its constitutionality when it is reasonable to do so." *Carver v. Louisiana Dep't of Pub. Safety*, 17-1340 (La. 1/30/18), 239 So.3d 226, 230.

Therefore, we first address Mr. Andrews' claims that the trial court erred in interpreting and applying Article 198. We begin with a discussion of the statutory language and the relevant legislative history.

## I. LOUISIANA'S FILIATION LAW

Louisiana Civil Code art. 198 addresses actions to avow paternity of a child and provides,

> A man may institute an action to establish his paternity of a child at any time except as provided in this Article. The action is strictly personal.
> If the child is presumed to be the child of another man, the action shall be instituted within one year from the day of the birth of the child. Nevertheless, if the mother in bad faith deceived the father of the child regarding his paternity, the action shall be instituted within one year from the day the father knew or should have known of his paternity, or

within ten years from the day of the birth of the child, whichever first occurs.

In all cases, the action shall be instituted no later than one year from the day of the death of the child.

The time periods in this Article are peremptive.

The general rule is that a man may bring an action to establish his paternity of a child at any time. However, the Louisiana legislature has established time limitations on the right to avow in two distinct instances—when the child is presumed to be the child of another man, and when the child has died. *See* La. C.C. art. 198, Revision Comment (d). A child born during a marriage or within 300 days of its termination is presumed to be the child of the mother's husband. La. C.C. art. 185. Therefore, because Ms. Kinnett was married at the time G.J.K. was born, Mr. Andrews' paternity action was subject to the one-year peremptive period that began on the day G.J.K. was born.

### A. Peremption

Peremption, by definition, designates a period of time for which a right exists and cannot be renounced, interrupted, or suspended. La. C.C. arts. 3458 & 3461; *Succession of Pizzillo*, 65 So.2d 783, 786 (La. 1953). However, as to Article 198, the legislature saw fit to include an exception to the default rule. *See infra* Section I.B. In the event the mother in bad faith deceives the father as to his paternity, the peremptory period does not begin to run until the moment in time at which the father knows or should know of his paternity. La. C.C. art. 198. If the exception applies, the father has one year from that time to file an avowal action, provided that the action is filed within ten years of the child's birth; otherwise a further peremptory period of ten years precludes bringing the action.[9]

---

[9] The legislature expressly defined the Article 198 time limitations as peremptive. As a matter of law, nothing may interfere with the running of a peremptive period, including *contra non valentem* exceptions, but Article 198 explicitly includes such an exception that suspends the running of the peremptory period. *See In re Medical Review Panel of Gerard Lindquist*, 18-444 (La. App. 5 Cir. 5/23/19), 274 So.3d 750, 755–56, *writ denied*, 19-01034 (La. 10/1/19) (doctrine of *contra non valentem* prevents the running of a prescriptive period when (1) "there is some legal cause which prevented the court or its officers from taking cognizance of and acting on the plaintiff's actions;" (2) "there is some condition coupled with the

### B. Legislative History

Because the ultimate goal when interpreting a statute is to give effect to the intent of the legislature, we review the legislative history of Civil Code arts. 191 and 198. *Fontenot v. Chevron U.S.A., Inc.*, 95-1425 (La. 7/2/96), 676 So.2d 557, 562. In 1991, the Louisiana State Law Institute began meeting with the House Marriage/Persons Committee to draft legislation that would eventually result in Act of the Louisiana Legislature No. 192 of 2005. Katherine Shaw Spaht, *Who's Your Momma, Who are Your Daddies? Louisiana's New Law of Filiation*, 67 LA. L. REV. 307, 307-08 (2007). The detailed legislative history of Act 192 reflects the legislature's attempt to balance the biological father's interest in an opportunity to parent against the explicit state policy of preserving the intact marriage and the best interests of the child.

House Bill 368 was filed during the 2004 regular session—on the recommendation of the Louisiana Law Institute—and testified to by Katherine Spaht, chairperson of the Louisiana Marriage/Persons Committee. H.R. 368, 30th Reg. Sess. (La. 2004) (failed House final passage); Louisiana House of Representatives, Civil Law Committee (4/5/2004), H.B. 368 *available at* https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2004/apr/0405 _04_CL# (48:13:00). The legislation's purpose was to provide for the filiation of children, and the bill included provisions aimed at updating the law to more closely align biological and legal paternity and address questions raised by evolving societal norms and scientific and technological advances.[10] Spaht, *supra*, at 314.

---

contract or coupled with the proceedings which prevented the plaintiff from suing or acting;" (3) "*the defendant has done some act effectually to prevent the plaintiff from availing himself of his cause of action*;" or (4) "*the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant*") (emphasis added). However, the Article 198 exception, requiring the mother's bad faith deceit, is consistent with the legislature's practice of including a fraud exception even when the time for filing suit is distinctly peremptive. *See* La. R.S. 9:5604(E) (actions for professional accounting liability), 9:5605(E) (actions for legal malpractice), and 9:5606(E) (actions for professional insurance agent liability).

[10] For example, questions raised by scientific developments permitting pregnancy by surrogacy and assisted conception prompted the Law Institute to include, for the first time, a provision in the law identifying the mother for purposes of filiation. La. C.C. art. 184; *see* Spaht, *supra*, at 309.

By far the most controversial articles the Law Institute proposed dealt with the issue of "dual paternity," which was "considered by the Law Institute Council on six separate occasions." Spaht, *supra*, at 308.

House Bill 368's answer to the question "whether the law should permit a child to have two legally recognized fathers" was proposed Article 197, allowing for an action by the child to establish paternity, and Article 198, recognizing a biological father's action to avow his child. *See* Spaht, *supra*, at 321-22. While the Law Institute concluded, based on the United States Supreme Court's decision in *Michael H. v. Gerald D.*,[11] that "denying the biological father of a child the right to establish his filiation when another man was presumed to be the father was not unconstitutional," the Institute opted to retain the jurisprudentially created concept of "dual paternity" granting the second father, if recognized, "all the legal rights and obligations of a legal father." Spaht, *supra*, at 321-22 & nn. 94-96. Yet, due to concern for the child's best interest, the proposed legislation placed far stricter limitations on the biological father's ability to establish paternity than those imposed on the child. *Id.* at 322-23.

House Bill 842, a stand-alone dual paternity statute with the same language as House Bill 368's proposed Article 198, was introduced in the House during the same session as a precaution in the event that House Bill 368 was held up in committee. H.B. 842, 30th Reg. Sess. (La. 2004) (Original) (enacted as 2004 La. Acts, No. 530 § 1, eff. June 25, 2004) *repealed by* 2005 La. Acts, No. 192 § 1, eff. June 29, 2005; Louisiana House of Representatives, Civil Law Committee (4/5/2004), H.B. 842 (statement of Rep. Johns), *available at* https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2004/apr/0405 _04_CL# (2:47:00-2:47:30).[12]

---

[11] 491 U.S. 110, 109 S.Ct. 2333, 105 L. Ed. 2d 91 (1989).
[12] Both bills went through virtually identical amendments, and eventually House Bill 842 became Act of the Legislature 530 of 2005, which created Louisiana Civil Code Article 191. 2004 La. Acts, No. 530.

As originally drafted, both bills allowed the biological father to institute an avowal action *only* if the marriage between the child's mother and her husband (the presumed father) had terminated.  However, if that condition was satisfied, House Bill 368 placed no time restriction on filing the action as long as the child was living.  Upon the death of the child, the father's action was subject to a one-year peremptory period.  *See* H.B. 368, 30th Reg. Sess. (La. 2004) (Original), Art. 198 Revision Comments 2004 (c), (f), *available at* http://www.legis.la.gov/legis/ ViewDocument.aspx?d=272841.  Almost immediately, however, House Bill 368 was amended to require the biological father to institute his avowal action within a peremptory period of two years from the date of the child's birth.  *See* H.B. 368 (Engrossed), *available at* http://www.legis.la.gov/legis/ViewDocument.aspx?d =272843; La. H.R. JOURNAL, 30th Reg. Sess., April 6, 2004, at 9. H.B. 842, 30th Reg. Sess. (La. 2004) (Original).

The house then voted to strike the language that denied the biological father the right to avow his paternity if the child's mother was married, providing instead a two-year period from the date of the child's birth to institute the action, regardless of the mother's marital status.  *See* Louisiana House Floor Debate, May 11, 2004, H.B. 368, *available at* https://house.louisiana.gov/H_Video/ VideoArchivePlayer?v=house/2004/may/0511_04_Day26_2004RS (1:37:50-1:40:06); H.R. JOURNAL, 30th Reg. Sess., May 11, 2004, at 30.  Concern that the law based a man's right to claim his child on the mother's marital status, especially when DNA evidence renders the father certain of his paternity, prompted the revision.  *See* Louisiana House Floor Debate, April 7, 2004, H.B. 368 (statements by Rep. Robbie Carter), *available at* https://house.louisiana.gov/H_Video/ VideoArchivePlayer?v=house/2004/apr/0407_04_Day07_2004RS (1:13:58-

1:18:45).[13]  The amendment's author was vehemently opposed to denying a biological father access to the courts and, therefore, the right to be recognized as the father of his child based on a condition that was out of his control.  *Id.*

As is evident from the comments to Article 198's originally proposed language, the Law Institute and some opponents of the amendment believed that denying the biological father the right to avow his child was necessary when the mother was still married to the presumed father.  *See* Louisiana House Floor Debate, May 11, 2004, H.B. 368 (statements by Rep. Bowler), *available at* https://house.louisiana.gov/H_Video/ VideoArchivePlayer?v=house/2004/may/ 0511_04_Day26_2004RS (1:44:15- 1:45:14).  Although jurisprudence "recognized the right of a father to institute an avowal action as a predicate to, or simultaneous with the exercising of parental rights," the comments stated that denying the biological father the right to establish his paternity when the mother was still married "serve[d] to protect a currently intact family unit to which the child belong[ed]."  *See* H.B. 368 (Engrossed), Art. 198 cmts (a)-(c) *available at* http://www.legis.la.gov/legis/ ViewDocument.aspx?d=272843.

Other opponents of the amendment and the law as originally drafted opined that even the two-year peremptory period was too restrictive if the biological father did not become aware of his paternity until after the two years had passed.  *See* Louisiana House Floor Debate, May 11, 2004, H.B. 368, *available at*

---

[13] The debates in the House emphasized a choice between upholding the presumption that the husband of the mother is the father of the child—by depriving the biological father of the right to avow and have a relationship with his child—and having the law recognize biological fact, which protects the rights of the biological father, but also, arguably, potentially harms the child.

The Law Institute and the House Committee chose to give the presumption absolute deference when the mother remained married to the father for two years after the child's birth, defending this decision by asserting the best interests of the child were better served by preserving the intact family.  The drafters of the statute acknowledged that the statute's purpose was to encourage marriage and children born in wedlock.  They also tacitly admitted that losing the right to be filiated to the child was the father's punishment for sleeping with and conceiving a child with a married woman.  *See* H.B. 368 (Engrossed), Art 198 cmt (b).  The importance of the child's interest in having a stable home environment, *see* La. C.C. art. 198  cmt (e), and a settled parentage, Spaht, *supra*, at 313, 316, 323, outweighed any interests the child and the biological father may have in a relationship with each other and any interest the child has in knowing the truth.

https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2004/may/051 1_04_Day26_2004RS (1:40:06-1:42:36). In response to these latter concerns, another amendment was proposed providing that "if the mother in bad faith deceived the father of the child regarding his paternity, the action shall be instituted within one year from the date the father knew or should have known of his paternity, but no more than ten years from the date of birth of the child." *Id.* at (1:47:31-1:58:35); H.R. JOURNAL, 30th Reg. Sess., May 11, 2004, at 30. The bad faith amendment prompted two major questions.

First, when asked whether the biological father had any recourse if the mother "in good faith believe[d]" that her husband was her child's father, the amendment author replied that the exception would apply only if the mother was in bad faith, but continued with an example of bad faith that had been discussed in committee hearings. *See* Louisiana House Floor Debate, May 11, 2004, H.B. 368, *available at* https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/ 2004/may/0511_04_Day26_2004RS (1:48:48-1:50:02). In the case referenced, a child was born during a marriage, and, upon divorce, the wife informed the husband that the child was the biological child of another man she had been having an affair with. *Id.* No details were given about statements the mother made to the husband during the marriage or how long the mother had known that the husband was not the child's biological father, but the amendment author stated that the wife had deceived the husband for a number of years, so, in essence, she was in bad faith.

The author's hypothetical prompted another question: in the case of bad faith deception, why limit the biological father's right to file an avowal action to ten years from the birth of the child? *See id.* at (1:50:02-1:51:07). The amendment's author responded that the exception was an attempt to balance the biological father's interests with the best interests of the child. *Id.* If a child had been living

in a stable home for more than ten years and had built a strong relationship with the man presumed to be his father, even if the mother was in bad faith, the Law Institute did not believe the biological father should have a right to disrupt that child's life. *Id.* at (1:48:15-1:48:37); *see* Louisiana Civil Code art. 198 cmt. (e).

The amendment incorporating the bad faith exception was adopted by a vote of 78 to 17. H.R. JOURNAL, 30th Reg. Sess., May 11, 2004, at 30. Thereafter, House Bill 368 failed to pass in its entirety. *Id.* at 31. However, the stand-alone dual paternity statute (H.B. 842), as amended to mirror the proposed Article 198, passed the House by a vote of 91 to 6. H.R. JOURNAL, 30th Reg. Sess., May 12, 2004, at 40.

Act of the Legislature No. 530 (H.B. 842) was signed into law on June 25, 2004, creating Louisiana Civil Code art. 191, which provided,

> A man may establish his paternity of a child presumed to be the child of another man even though the presumption has not been rebutted. This action shall be instituted within two years from the date of birth of the child, except as may otherwise be provided by law. Nonetheless, if the mother in bad faith deceives the father of the child regarding his paternity, the action shall be instituted within one year from the date the father knew or should have known of his paternity, but no more than ten years from the date of birth of the child.

During the 2005 Regular Session, the Law Institute recommended House Bill 91, again proposing changes to the law of filiation after House Bill 368 failed to pass. H.B. 91, 31st Reg. Sess. (La. 2005); S. GREENSHEET DIGEST, H.B. 91, p.2, 31st Reg. Sess. (La. 2005). The proposed Article 198 replaced Civil Code art. 191 as enacted in 2004 with one substantive change that shortened the peremptory period to one year from the date of the birth of the child unless the mother in bad faith deceived the father as to his paternity. *See* La. C.C. art. 198 cmt. (a); S. GREENSHEET DIGEST, H.B. 91, p.2, 31st Reg. Sess. (La. 2005); 2005 La. Acts No. 192.

## II.  WHETHER TRIAL COURT ERRED IN FINDING THAT AVOWAL ACTION WAS PEREMPTED

Mr. Andrews raises several assignments of error relating to the trial court's application of Article 198 to the facts of this case, which resulted in a ruling that Mr. Andrews' avowal action was untimely filed and, therefore, perempted.  First, Mr. Andrews argues that the trial court incorrectly placed the burden of proof on him to prove that Ms. Kinnett "in bad faith deceive[d]" him as to his paternity instead of requiring Mr. Kinnett, as the exceptor,  to prove that Mr. Andrews' claim was perempted.  Second, Mr. Andrews argues that the trial court erred in interpreting the phrases "in bad faith deceived" and "knew or should have known."  Finally, he argues that the trial court erred in finding that there was no evidence of bad faith deception on Ms. Kinnett's part.

For the reasons clearly delineated below, we find that the trial court erred in placing the burden of proof upon Mr. Andrews to prove Ms. Kinnett's bad faith deceit.  However, even if the burden of proof was properly upon Mr. Andrews, the evidence establishes that the trial court's finding on the issue of bad faith deceit was manifestly erroneous.  Further, upon *de novo* review, we find that the evidence establishes that Mr. Andrews' avowal action was timely filed less than one year after he knew or should have known of his paternity.

### A.  *Standard of Review*

An exception of peremption is a peremptory exception.  La. C.C.P. art. 927(A)(2).  As peremption has been characterized as a form of prescription, the rules governing the burden of proof and standard of review for prescription apply. *See, e.g.*, *Rando v. Anco Insulations Inc.*, 08-1163 (La. 5/22/09), 16 So.3d 1065, 1082.  Peremptive statutes are strictly construed against peremption and in favor of the claim.  *Rando*, 16 So.3d at 1083.

When a hearing is held on a peremptory exception prior to trial, evidence may be introduced to support or controvert the exception. La. C.C.P. art. 931. If no evidence is presented, the court must decide the exception of peremption on the facts alleged in the petition accepting the plaintiff's allegations as true. *Lomont v. Bennett*, 14-2483 (La. 6/30/15), 172 So.3d 620, 627. When evidence is introduced, the court will decide the facts based on the evidence presented, and the trial court's factual conclusions are subject to a manifest error or clearly wrong standard of review. *Id.*; La. C.C.P. art. 931; *see, e.g.*, *Bijeaux v. Broyles*, 11-830 (La. App. 3 Cir. 2/8/12), 88 So.3d 523, 526, *writ denied*, 12-0970 (La. 6/22/12), 91 So.3d 971.

### B. *June 2, 2017 Hearing*

At the onset of the June 2, 2017 hearing, brief argument was made as to which party bore the burden of proof on the exception of peremption. Mr. Kinnett's counsel admitted to carrying the burden of proof on the exception but argued that he needed to prove only that the avowal action was filed more than one year after the child's birth. Once Mr. Kinnett met that burden, his counsel argued, the burden shifted to Mr. Andrews to prove that Ms. Kinnett deceived him in bad faith as to his paternity and that he did not know and should not have known that fact. Mr. Andrews' counsel countered that the burden should remain with the exceptor, as Mr. Andrews had affirmatively pled an exception to peremption in his avowal petition.

Ultimately, before the judge ruled on the issue, Mr. Kinnett's counsel offered to proceed first and called Mr. Andrews to the stand. Thereafter, despite Mr. Andrews' request to present first if the judge placed the burden of proof upon him, the judge permitted Mr. Kinnett's counsel to proceed.

Still, upon review, it appears the trial court placed the burden of proof for the peremption exception on Mr. Andrews. The trial court's oral reasons for judgment given from the bench reflect that, rather than focusing on Ms. Kinnett's

behavior and possible motives, the trial judge was most concerned with Mr. Andrews' responsibility upon being told that a woman he had been intimate with in the past year had given birth to a child. After Mr. Andrews testified that Ms. Kinnett had led him to believe that she knew Mr. Kinnett was the child's father, the trial judge referred to Mr. Andrews' testimony that when Ms. Kinnett first told him she had given birth to a child in the fall of 2015, "it ran through my mind that there was a possibility I could be the father of the child."

Rather than considering whether it was more probable than not that Ms. Kinnett intentionally insinuated or affirmatively stated that Mr. Kinnett and not Mr. Andrews was G.J.K.'s father, and whether such an act qualifies as bad faith deception, the trial court questioned how Mr. Andrews could possibly claim that he was deceived when it crossed his mind that he could be the father and Mr. Andrews failed to satisfy what the judge believed was "a moral and a legal obligation to simply ask, is this my child?"

While an appeal is taken from the judgment, not the trial court's reasons for judgment, a trial court's oral or written reasons may be considered in determining whether the court committed legal error. *See Winfield v. Dih*, 01-1357 (La. App. 4 Cir. 4/24/02), 816 So.2d 942, 948; *Wooley v. Lucksinger*, 09-0571 (La. 4/1/11), 61 So.3d 507, 572. When the trial court commits an error that interdicts the fact-finding process, it is appropriate for the appellate court to review the record *de novo* and render judgment. *See Winfield*, 816 So.2d at 948; *Evans v. Lungrin,* 708 So.2d 731, 735 (La. 1998). Therefore, having determined that the burden of proof was placed on Mr. Andrews, we now determine whether that decision constituted legal error.

### C. Burden of Proof

While the party who raises the exception of peremption generally bears the burden of proof, when peremption is evident on the face of the pleadings, the

plaintiff will bear the burden of proving that the claim is not perempted. *See, e.g.*, *Bijeaux*, 88 So.3d at 526; *Carriere v. Bodenheimer, Jones, Szwak, & Winchell, L.L.P.*, 47,186 (La. App. 2 Cir. 8/22/12), 120 So.3d 281, 283-84, *overruled by Lomont*, 172 So.3d 620.

Mr. Kinnett argues that, as Mr. Andrews' claim was filed more than one year after G.J.K.'s birth, it was perempted on its face. Therefore, the trial court was correct in requiring Mr. Andrews to prove Ms. Kinnett's bad faith deceit. However, in *Lomont v. Bennett*, the Louisiana Supreme Court found that when a plaintiff's petition makes a *prima facie* showing that the claim was timely filed because a statutory exception rendered the peremptive period inapplicable, the burden of proof remains with the party who filed the exception. 172 So.3d at 626-27. *See also Gerard Lindquist*, 274 So.3d 750; *N.G. v. A. C.*, 19-307 (La. App. 3 Cir. 10/2/19), 281 So.3d 727.

Article 198 contains a statutory exception that will prevent the running of the peremptory period and states in pertinent part, "if the mother in bad faith deceived the father of the child regarding his paternity, the action shall be instituted within one year from the day the father knew or should have known of his paternity." Reading the plain language of the statute, the question of when Mr. Andrews learned of his paternity arises only in the event that Ms. Kinnett deceived him in bad faith as to his paternity. Therefore, Mr. Andrews was required to plead both that Ms. Kinnett deceived him in bad faith, and also that he did not know and should not have known of his paternity for more than one year before filing his avowal action.

In his paternity petition, Mr. Andrews specifically alleged that, after having sex with Ms. Kinnett in November of 2014, he had no further contact with her until fall 2015, at which time, he alleged, Ms. Kinnett told him that she had become pregnant by her husband and had a son "with him." The petition further alleged

that Ms. Kinnett concealed that Mr. Andrews was possibly G.J.K.'s father until December 9, 2016, when she called to inform him that a sibling DNA test had revealed that her husband was not the child's father. Furthermore, Mr. Andrews' petition specifically alleged that, because of the previously delineated facts, the time period for filing his action was one year from the day he knew or should have known of his paternity, December 9, 2016. In light of the allegations contained in Mr. Andrews' petition, we find that—as Mr. Andrews specifically pled a statutory exception which would render the peremptive period inapplicable—Mr. Kinnett, as the party claiming peremption, bore the burden of proving that the bad faith deception exception provided for in Article 198 was not applicable, and it was error for the trial court to assign the burden of proving bad faith deception to Mr. Andrews.

Placing the burden of proof on the wrong party is legal error that will interdict the fact-finding process by placing a more onerous standard than the law requires on one of the parties. *Barnett v. Barnett*, 15-766 (La. App. 5 Cir. 5/26/16), 193 So.3d 460, 466 (citing *Leger v. Leger*, 03-419 (La. App. 3 Cir. 7/2/03), 854 So.2d 955, 957). Therefore, the trial court's factual findings—that Ms. Kinnett was not in bad faith and also that Mr. Andrews knew or should have known of his paternity on September 1, 2015—are no longer entitled to the manifest error standard of review. *Id.* (citing *Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731, 735). Since the record is otherwise complete, we will conduct a *de novo* review to determine whether Mr. Kinnett satisfied his burden of proving that Article 198's bad faith deception exception to peremption did not apply in Mr. Andrews' case by proving, by a preponderance of the evidence, either that Ms. Kinnett did not engage in bad faith deception or that Mr. Andrews knew or should have known of his paternity for more than one year prior to filing his avowal action. For the reasons elucidated below, we find that Mr. Kinnett failed to

meet his burden of establishing that the bad faith deception exception did not apply.

### D. *"In Bad Faith Deceives"*

The trial court found "no evidence to suggest . . . that Mrs. Kinnett satisfied the technical wording of the statute in being, quote unquote, in bad faith and being deceptive."[14]  Rather, the trial court found that if Ms. Kinnett *believed* the child was Mr. Kinnett's, and she told Mr. Andrews that the child was her husband's based on this belief, "then she wouldn't be deceptive.  She might have been mistaken[,] but she wasn't deceptive."

Reviewing the trial court's judgment requires us to take up *res nova* the interpretation of Article 198's phrase "in bad faith deceives."  A law that is clear and unambiguous shall be applied as written when "its application does not lead to absurd consequences."  La. C.C. art. 9.  But, "[w]hen the literal construction of a statute produces absurd or unreasonable results, 'the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result.'" *Fontenot*, 676 So.2d at 562 (quoting *Green v. Louisiana Underwriters Insurance Co.*, 571 So.2d 610, 613 (La. 1990).  While the plain meaning of the words is a relevant consideration for statutory interpretation, *see* La. C.C. art. 11,[15] as discussed above, the ultimate goal is to give effect to the intention of the legislature.  *See, e.g.*, *Fontenot*, 676 So.2d at 562.  In determining the generally prevailing meaning of terms used within a statute, dictionaries may "provide a useful starting point . . . by suggesting what the legislature could have meant by using particular terms." *Hopkins v. Howard*, 05-0732 (La. App. 4 Cir. 4/5/06), 930 So.2d 999, 1005 (quoting 2A Norman Singer, *Statutes and Statutory Construction* § 47:28 (6th ed. 2000)).

---

[14] The trial court relied in large part upon two text messages introduced into evidence to reach his factual findings.  *See infra* note 33.

[15] "The words of a law must be given their generally prevailing meaning."

Black's Law Dictionary defines "bad faith" as "[d]ishonesty of belief, purpose, or motive" and lists the following types of bad faith that have been recognized in judicial decisions: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." BLACK'S LAW DICTIONARY (11th ed. 2019). Bad faith has also been defined as

> the opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. Term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.

*Bordelon v. Medical Center of Baton Rouge*, 03-0202 (La. 10/21/03), 871 So.2d 1075, 1083 n.7.

Black's Law Dictionary recognizes "good faith" to include, among other things, "honesty in belief or purpose" and "the absence of malice and the absence of design to defraud or seek unconscionable advantage." *Id.*; BLACK'S LAW DICTIONARY (11th ed. 2019). Good faith does not include various types of conduct that are characterized as "bad faith" because "they violated community standards of decency, fairness[,] or reasonableness." *Good faith*, BLACK'S LAW DICTIONARY (11th ed. 2019).

The definition of "deceit," according to Black's Law Dictionary includes both "intentionally leading someone to believe something that is not true; an act designed to deceive or trick," and "[a] false statement of fact made by a person knowingly or recklessly (i.e., not caring whether it is true or false) with the intent that someone else will act on it." BLACK'S LAW DICTIONARY (11th ed. 2019).

First, we address Mr. Kinnett's[16] argument that Ms. Kinnett could not deceive Mr. Andrews as to his paternity because she did not know who the father of her child was at the time of her September 1, 2015 conversation with Mr. Andrews. Ms. Kinnett testified that she contacted Mr. Andrews to inform him of his paternity within twenty minutes of learning the truth herself on December 9, 2016. Mr. Kinnett argues that before receiving the test results, as evidenced by a post filing text message she sent to Mr. Andrews in February of 2017, Ms. Kinnett believed, "I did not deceive you. I had no idea." Therefore, Mr. Kinnett posits, there is "no evidence that [Ms. Kinnett] provided fraudulent statements that created a false belief in [Mr. Andrews'] mind."

This argument has two distinct parts. First, Mr. Kinnett argues that Ms. Kinnett could not have the intent to deceive if she relayed information she believed to be true or that she had no way of knowing was false. As will be further discussed below, being *unsure* of who the father was is not the same as having *no idea* who the father might be. Ms. Kinnett did not allege that she informed Mr. Andrews of the fact that he was possibly the father of the child she bore, although she admitted on the witness stand that she was aware of that possibility during her pregnancy and when the child was born.

Conversely, Mr. Andrews testified that during the September, 2015 conversation, Ms. Kinnett informed him that she had sexual relations with her husband, got pregnant, had a son, and was staying in her marriage for the sake of her children. That brings us to the second part of Mr. Kinnett's argument, that "deceit" requires a *false* statement. Therefore, if Ms. Kinnett's version of the conversation accurately reflects what she said, she relayed only the truth. She

---

[16] By the June 2, 2017 hearing, Ms. Kinnett had aligned herself with Mr. Kinnett, arguing in favor of peremption. Mr. Kinnett's arguments on the issue of whether Ms. Kinnett deceived Mr. Andrews in bad faith as to his paternity have since been fully adopted by Ms. Kinnett in briefs to this Court.

admits to saying that she "had a baby, and that [she] was trying to work on [her] marriage."

Article 198's legislative history, discussed in detail above, reveals the legislature's original purpose in adding the bad faith exception was to provide a route to avowal for men who do not become aware of their paternity until after the peremptory period has lapsed. *See* discussion *supra,* Section I.B. In particular, the legislature's discussion regarding the hypothetical woman who "holds an honest belief" that her husband is the father and the author's response to his own hypothetical— that a woman who first informs her husband that another man is her child's father upon divorce is guilty of deceiving her husband for a number of years—along with the exception's wording, disclose the legislature's intended meaning of the terms "bad faith" and "deceit" and a concomitant inability to contemplate a scenario wherein a man could be truly unaware of his paternity without bad faith deceit on the part of the mother. *Id.* This exchange also emphasizes the fact that the words "bad faith" and "deceit," as intended by the legislature, have specific definitions in the law.[17]

Very little case law has interpreted the bad faith deception exception since Article 198's passage. However, the Third Circuit briefly addressed the same exception contained in Article 191, Article 198's predecessor. *See Mouret v. Godeaux*, 04-496 (La. App. 3 Cir. 11/10/04), 886 So.2d 1217, 1221, 1222 n. 2. In *Mouret*, the biological father received DNA proof of his paternity within three months of the child's birth, but failed to file an avowal action for more than two years thereafter. *Id.* at 1219. However, the *Mouret* court pointed out that there was no evidence in that case that the mother "concealed information about [the

---

[17] A concept of law bearing upon questions of bad faith, deceit, and fraud provides that a person is liable for remaining silent only when there is a duty to speak. *See e.g., McCarthy v. Evolution Petroleum Corp.*, 14-2607 (La. 10/14/15), 180 So.3d 252, 258. The bad faith amendment's legislative history indicates that body's belief that the mother has a duty to speak.

child] from Mr. Mouret," or "actively or passively created a misimpression about the child's paternity." *Id.* at 1222 n.2.

The question is, then, does a mother, who has singular knowledge of the men with whom she has been intimate, the dates on which she has had sexual encounters with each, the effectiveness of her birth control method if any, her menstrual cycle, and the approximate date of conception, have a duty to inform both the legal and the potential biological father(s) of the possible paternity of the biological father(s)? To interpret Article 198 to permit a mother to prevaricate, dissimulate, and engage in perfidious silence as to a man's potential paternity and yet be found innocent of deceiving the putative father in bad faith—because she lies by omission rather than by commission of a false statement—flies in the face of the common definition of both "bad faith" and "deceit," belies Article 198's legislative history, and leads to unjust results.

Further, such an interpretation calls into question the statute's constitutionality.[18] Another well-settled principle of law requires that when a statute is susceptible of two constructions, one of which would render it unconstitutional or raise grave constitutional questions, this Court must adopt the interpretation of the statute which, without doing violence to its language, will maintain its constitutionality." *M.J. Farms, Ltd.*, 998 So.2d at 31-32 (citing *Hondroulis v. Schuhmacher*, 553 So.2d 398, 416-417 (La. 1988)); *Metro Riverboat*

---

[18] The Louisiana Supreme Court has recognized that a biological father's right to the opportunity to develop a relationship with his child is a constitutionally protected interest deserving of Due Process protection. *In re A.J.F.*, 00-0948 (La. 6/30/00), 764 So.2d 47, 57. Imposing a duty on the mother to inform the biological father of the possibility of his paternity would serve the state's explicit policy interest in protecting the child and settling his paternity early. While it would not serve the state's goal of preserving the intact family, because an avowal action would disrupt the marriage, once a spouse engages in an extra-marital affair, it is questionable whether the State's interest in preserving that union is legitimate, much less compelling. Also, short of imposing an affirmative duty on the mother to inform all possible fathers of their potential paternity, extending the biological father's right to avow the child in the face of the mother's silence incentivizes her to come forward early. A mother's choice to conceal that a man is the possible father of her child from all interested parties, thereby preserving her intact family with a falsehood, should not serve to terminate the biological father's right to an opportunity to establish a relationship with his child.

*Associates, Inc. v. Louisiana Gaming Control Bd.*, 01-0185 (La. 10/16/01), 797 So.2d 656, 662; *Crown Beverage Co.*, 695 So.2d at 1093.

Finally, as we explain below, there is no set of circumstances wherein a woman—who has had sexual relations with more than one man during the period of possible conception—may have an "honest belief" that one man, and not the other, is the father. Thus, based upon the foregoing, we find that a mother's act of withholding pertinent information or creating a misimpression through statements, actions, or inactions satisfies the definition of "deceives" within the context of Article 198.

Mr. Kinnett additionally asserts that there is "no evidence that [Ms. Kinnett] made a false statement knowingly or recklessly, with or without the intent that [Mr. Andrews] would act on it" because "[w]hen Karen and [Mr. Andrews] communicated on September 1, 2015, she did not doubt that her husband was the father of G.J.K." Mr. Kinnett argues, as the trial court found, "She might have been mistaken, but she wasn't deceptive." He argues that Mr. Andrews presented insufficient evidence to refute Ms. Kinnett's statement that she "had no idea" who the actual father of her child was prior to the December 9, 2016 sibling DNA test results. However, we find that Ms. Kinnett may not escape being found deceitful and in bad faith based upon her claim that she *believed* Mr. Kinnett fathered her child.

As discussed above, Ms. Kinnett had singular knowledge of the date on which she had intimate relations with both men,[19] her attentiveness to her chosen birth control method on each occasion,[20] and the date on which the baby was due

---

[19] In spite of telling Mr. Andrews that she did not sleep with her husband, by necessity, Ms. Kinnett would have had to have been intimate with both men within a relatively short period of time for her to harbor a hope that her husband was the biological father and to conceal from her husband both her infidelity and the possibility that he was not the father of her child.

[20] Testimony from the various hearings suggests that Ms. Kinnett's choice of birth control depended on Ms. Kinnett's application of the device at a certain time for it to be effective. Mr. Andrews testified that, after the fact of his paternity became known, Ms. Kinnett admitted to inserting the device a week late.

17-CA-625                                    26

as given to her by her treating physician. Moreover, Ms. Kinnett admitted to knowing that Mr. Andrews could be her child's father throughout her pregnancy and after G.J.K.'s birth. When asked "[a]t any time, while you were pregnant . . . were you aware that he [Mr. Andrews] could be the father," Ms. Kinnett responded, "I was aware that he could be, but I believed that my husband was the father." She testified, "He was in a relationship and he ended things with me, so why would I tell him I was pregnant?"

Black's Law Dictionary defines "good-faith mistake" as "[a]n honest error that involves neither cynical sabotage nor subconscious bias against accomplishing something." BLACK'S LAW DICTIONARY (11th ed. 2019). Moreover, "[a] party alleging good faith can not (*sic*) close her ears to information or her eyes to suspicious circumstances. She must not act blindly or without reasonable precautions." *Succession of Chavis,* 211 La. 313, 320, 29 So.2d 860, 863 (La. 1947).

Either Ms. Kinnett had not been intimate with her husband during the period G.J.K. was conceived—and therefore knew that Mr. Andrews was the child's father and failed to disclose his paternity to him—or she had been intimate with both her husband and Mr. Andrews—and therefore did not know for certain who the child's father was—yet failed to tell Mr. Andrews that he could possibly be her child's father. If, however, Ms. Kinnett had been intimate with both her husband and Mr. Andrews during the period of conception, it was impossible for Ms. Kinnett to *truthfully* assert or insinuate to anyone that she was sure that Mr. Kinnett was the father of her child. It was also impossible for her to have an *honest* belief that Mr. Kinnett was definitely G.J.K.'s father. Minimally, Ms. Kinnett engaged in self-deception, and her dishonesty of belief cast her in bad faith.

---

Mr. Andrews' counsel desisted from questioning Ms. Kinnett about her use of the NuvaRing® birth control device around the time G.J.K. was conceived after the trial judge stated that the information was irrelevant because no birth control method, aside from abstinence, is 100% effective.

As to whether Ms. Kinnett engaged in more than self-deception, intending in September, 2015 to deceive Mr. Andrews in bad faith, there is no evidence to suggest that Ms. Kinnett did not intend for Mr. Andrews to believe that her husband was G.J.K.'s father until she revealed the DNA results on December 9, 2016. Ms. Kinnett's act of keeping her pregnancy a secret, her testimony regarding her beliefs about G.J.K.'s parentage, her recollections of the September 1, 2015 conversation with Mr. Andrews, and the actions of both Mr. Andrews and Ms. Kinnett in the sixteen months between September 1, 2015 and December 9, 2016, fail to demonstrate by a preponderance of the evidence that Ms. Kinnett did not deceive Mr. Andrews in bad faith regarding his paternity.

The substance of the September 1, 2015 exchange between Mr. Andrews and Ms. Kinnett is the subject of multiple versions. Mr. Andrews testified that Ms. Kinnett told him that she "had gotten together with her husband one random night" and that her husband was the father of the child she had given birth to some weeks earlier.[21]

Ms. Kinnett's testimony regarding the information she relayed to Mr. Andrews during their September 1, 2015 conversation is inconsistent. In response to requests for admission, she admitted that "in the fall of 2015 . . . when you (Ms. Kinnett) informed Keith Andrews . . . that you had given birth to a child, you informed Keith Andrews that Jarred Brandon Kinnett was the child's father."[22] Later, at the hearing on the exceptions before the Domestic Commissioner, after Ms. Kinnett reversed her litigation position from supporting Mr. Andrews' petition to opposing it, Ms. Kinnett responded "yes" when asked if

---

[21] Mr. Andrews testified that he was told only that Ms. Kinnett had a "newborn," not the child's age or the date of birth.

[22] Ms. Kinnett was cross-examined at the June 12, 2017 hearing on her responses to requests for admission. Thereafter, Mr. Andrews offered the responses into evidence without objection. The clerk of court, however, failed to properly record that the exhibit had been "received." When the transcript and the clerk's record are inconsistent, the transcript prevails. *See, e.g.,* State v. Galle, 11-0930 (La. App. 4 Cir. 2/13/13), 107 So.3d 916, 934.

she informed Mr. Andrews that "Mr. Jared Brandon Kinnett was the child's father." However, when subsequently asked, "[y]ou specifically told Mr. Andrews that," she responded, "I told him that I had a child and that I was trying to work on my marriage." Confused by the exchange, the Commissioner asked her to clarify whether she told Mr. Andrews that the child was her husband's; she initially responded, "yeah, I told him it was my husband's child." However, she then continued, "[a]ctually, I don't even recall if I—I think the message was that I had had a baby and that I was trying to work on my marriage."

Regardless of the exact language she used on September 1, 2015, Ms. Kinnett was clear about her intentions during that conversation. Both during the April 12, 2017 hearing before the Domestic Commissioner and the June 2, 2017 hearing before the district court, she explained that she informed Mr. Andrews of her intentions to stay in her marriage and work it out with her husband because she "did not want to talk to [Mr. Andrews]" or "be bothered by him anymore." She further testified that she had no doubts that Mr. Kinnett was the father of her child.

In keeping with our duty to interpret the statute in a manner that preserves its constitutionality, we find as a matter of law that a married woman—whose husband is presumed to be the father of her child—who knows that it is possible that another man is the child's biological father has a duty to inform that man of his possible paternity. Failure to so inform the possible biological father is bad faith deceit as contemplated in Civil Code art. 198. Therefore, for the aforementioned reasons, we find that Mr. Kinnett did not satisfy his burden of proving that Ms. Kinnett did not deceive Mr. Andrews in bad faith regarding his paternity of G.J.K. However, even if the trial judge correctly placed the burden of proof upon Mr. Andrews, we find that there was no factual basis for the trial court's finding that Ms. Kinnett did not engage in bad faith deceit.

In the absence of legal error, we would review the trial court's findings of fact on the issue of bad faith deception for manifest error. *See Wooley*, 61 So.3d at 554. When reviewing factual findings for error, the relevant question is not whether the finding was right or wrong, but whether the conclusion reached by the finder of fact was reasonable. *Id.* at 555 (citing *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La.1993)). However, a reviewing court does not simply search the record for some evidence that supports the trial court's finding; the record when viewed in its entirety must establish a reasonable basis for the trial court's conclusion. *Id.* at 554-55. Under the manifest error standard, the appellate court may reverse a finding of fact when the appellate court reviews the record in its entirety and determines (1) that a reasonable factual basis does not exist for the finding, and (2) that the record establishes that the fact finder was clearly wrong. *Lomont*, 172 So.3d at 633 (citing *Bonin v. Ferrellgas*, 03-3024 (La. 7/2/04), 877 So.2d 89, 94-95).

The trial court accepted Ms. Kinnett's testimony that she *believed* her husband was G.J.K.'s father, both during her pregnancy and after the baby was born, as well as her contention that she was completely unaware of the fact that Mr. Andrews was G.J.K.'s biological father until she received the results of the sibling DNA test on December 9, 2016. Prior to that date, the trial court opined, if Ms. Kinnett told Mr. Andrews that she thought her husband was G.J.K.'s father, she might have been mistaken but not deceptive.

When findings of fact are based on judgments regarding the credibility of witnesses, the trial court's determinations are entitled to great deference. *Id.*; *Wooley*, 61 So.3d at 554. However,

> [w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear

wrongness even in a finding purportedly based upon a credibility determination.

*Id.* at 554 (quoting *Rossell v. ESCO*, 549 So.2d 840, 844-45 (La.1989)).

Our review of the entire record, as discussed above, leads us to conclude that there was no factual basis upon which the trial court could reasonably conclude that Ms. Kinnett did not deceive Mr. Andrews in bad faith regarding his paternity of G.J.K., and that finding was manifestly erroneous.

Ms. Kinnett's version of events, as discussed in detail above, was inconsistent, ever evolving, and implausible such that it was clear error for the trial court to credit her story. Her testimony changed regarding whether she told Mr. Andrews her husband was her child's father. As discussed above, the finding that Ms. Kinnett was honest in her testimony that she believed her husband, and not Mr. Andrews, was her child's father is not supported by the evidence. Furthermore, if Ms. Kinnett believed her husband was the child's father, the likelihood that she told Mr. Andrews that the child was her husband's increases, which would mean that she made a speculative statement as fact, having no justification for believing that it was anything more than speculation.

The evidence and testimony presented establish that Ms. Kinnett, knowing that Mr. Andrews was at least fifty percent likely to be the child's father, concealed the pregnancy then informed or implied to Mr. Andrews that her husband was the father. The timing of both the DNA test and admission to Mr. Andrews of his paternity just before she filed for divorce supports Mr. Andrews' testimony that Ms. Kinnett claimed the child was the child of her marriage until December, 2016. Based upon the evidence Mr. Andrews presented, it is more probable than not that Ms. Kinnett deceived him as to the child's paternity until she was ready for a divorce in December, 2016.

Further, the trial court's finding that Ms. Kinnett was not in bad faith was an error of material fact as this finding limited the peremptory period within which Mr. Andrews was required to file an avowal action to one year from his child's birth.[23] As we find the trial court here committed both a reversible error of law and a manifest error of material fact and the appellate record is sufficient, it is incumbent upon us to re-determine the facts *de novo* from the entire record and render a judgment in this case on the merits. *Wooley*, 61 So.3d at 555 (citing *Ferrell v. Fireman's Fund Ins. Co.*, 94-1252 (La. 2/20/95), 650 So.2d 742, 745). Therefore, we now examine the trial court's finding that Mr. Andrews did not file his avowal action within one year of the date that he knew or should have known of his paternity.

### E. "Knew or Should Have Known"

After Ms. Kinnett informed Mr. Andrews of G.J.K's birth and that she intended to attempt to make her marriage work in September of 2015, he did not insert himself into her marriage by filing a paternity action or attempting to see the child.[24] However, he submitted to a DNA paternity test the day after her December 9, 2016 phone call. His avowal action was filed within three months of the date Ms. Kinnett alleged she first discovered Mr. Andrews' paternity and informed him of it.

As he expressed in his oral reasons for judgment, the trial court granted the exception of peremption, in part, because it found that Mr. Andrews failed to file his avowal action within one year from the day he knew or should have known of

---

[23] Unless Ms. Kinnett is found to have in bad faith deceived Mr. Andrews as to his paternity, the court does not appropriately consider the issue of when Mr. Andrews knew or should have known of his paternity.

[24] To interpret the statute to require a possible biological father to interject himself into an intact marriage in a manner that would, in all probability, cause intense marital strife based upon a thought that "crossed [his] mind" when the mother said she was trying to make the marriage work would flout the Louisiana Legislature's stated public policy of protecting both the intact marriage and the child "from the upheaval of such litigation and its consequences in circumstances where the child may actually live in an existing intact family with his mother and presumed father." La. C.C. art. 198 cmt. (e).

his paternity—September 1, 2015. In other words, the judge applied the peremptory period provided for if Article 198's bad faith exception is triggered. That date being also outside the one-year period from the day of the child's birth—the default peremptory period for filing an avowal action pursuant to Article 198—the trial court granted the exception of peremption without an in-depth analysis of whether the mother in bad faith deceived Mr. Andrews as to his paternity.[25]

We find that the trial court erred in its interpretation of Article 198's "knew or should have known" language, and therefore, manifestly erred in finding that Mr. Andrews knew or should have known that he was G.J.K.'s father after his September 1, 2015 conversation with Ms. Kinnett, that finding being unsupported by the record.

As discussed above, we begin our interpretation of "knew or should have known" by looking first to the language of the statute itself, giving words their ordinary meaning. La. C.C. art. 11; *In re Succession of Boyter*, 99-0761 (La. 1/7/00), 756 So.2d 1122, 1128-29. We do not question whether the trial court was aware of the generally prevailing meaning of the phrase "knew or should have known" itself, but rather, whether the trial court committed an error of law when it found that Mr. Andrews was required to file his avowal action one year from the date he knew or should have known that a *possibility* existed that he was G.J.K.'s father.

The definition of "knowledge," according to Black's Law Dictionary, is "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact." BLACK'S LAW DICTIONARY (11th ed. 2019). Knowledge may be attributed to an individual

---

[25] After explaining the case law and evidence that led to his conclusion that Mr. Andrews "certainly knew or should have known" of his paternity more than one year prior to February 10, 2017, the trial court found "there's been no evidence to suggest to me that Mrs. Kinnett satisfied the technical wording of the statute in being, quote unquote, in bad faith and being deceptive. But the statute is clear that he shall institute within one year of the day he knew or should have known of his paternity."

when there is "[d]irect and clear knowledge" and also when a person has "[k]nowledge of information that would lead a reasonable person to inquire further." *Id.*

"Constructive knowledge," refers to the "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Id.* In the context of determining whether a person had knowledge sufficient to trigger the running of a prescriptive period, "constructive knowledge" denotes "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *See, e.g.*, *Campo v. Correa*, 01-2707 (La. 6/21/02), 828 So.2d 502, 510-11 (medical malpractice); *Thompson v. Thompson*, 14-963 (La. App. 3 Cir. 3/4/15), 159 So.3d 1121, 1125 (citing *In re Succession of Bernat*, 13-277 (La. App. 3 Cir. 10/9/13), 123 So.3d 1277, *writ denied*, 13-2640 (La. 2/7/14), 131 So.3d 865). Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. *Campo*, 828 So.2d at 511.

A mere apprehension does not trigger the running of peremption. *Murray v. Ward*, 18-1371 (La. App. 1 Cir. 6/10/19), 280 So.3d 625, 630, *writ denied sub nom. Murray v. Samuel C. Ward, Jr. & Associates*, *LLC*, 19-01149 (La. 10/21/19), 280 So.3d 1166. Rather a plaintiff must receive facts from which a reasonable person would assume the ultimate fact at issue exists. *See, e.g.*, *Id.* at 630 ("A plaintiff's mere apprehension that something may be wrong is insufficient to commence the running of peremption unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice."); *see also Powell v. St. Francis Med. Ctr., Inc.*, 52,462 (La. App. 2 Cir. 2/27/19), 265 So.3d 1184, 1186. The ultimate issue in determining whether a person had constructive knowledge sufficient to commence a peremptive period is the "reasonableness of the plaintiff's action or

inaction in light of his education, intelligence, and the nature of the defendant's conduct." *See, e.g.*, *Wells v. Zadeck*, 11-1232 (La. 3/30/12), 89 So.3d 1145, 1151.

There is a difference between what the plaintiff *knew or should have known* at the relevant time and what he *could* have known through further research. *Gerard Lindquist*, 274 So.3d at 761; *Wells*, 89 So.3d at 1152. The inquiry into the reasonableness of the plaintiff's action or inaction properly focuses on the knowledge he actually possessed. *See Wells*, 89 So.3d at 1152. Furthermore, for the cause of action to be reasonably knowable to the plaintiff, such that the peremptive period begins to run, the plaintiff must have "knowledge of facts strongly suggestive" of the ultimate issue and there must be no effort by the defendant "to mislead or cover up information [that] is available to plaintiff through inquiry." *Powell*, 265 So.3d at 1187.

When the defendant's fraud or bad faith prevents the filing of the action within the statutory peremptive or prescriptive period, this Court has held that, "the mere availability of information, in and of itself, cannot serve as sufficient constructive knowledge of a plaintiff's cause of action to start the running of prescription." *Gerard Lindquist*, 274 So.3d at 761 (citing *Lennie v. Exxon Mobil Corp.*, 17-204 (La. App. 5 Cir. 6/27/18), 251 So.3d 637, 646, *writ denied*, 18-1435 (La. 11/20/18), 256 So.3d 994). When a plaintiff has been "lulled into a course of inaction in the enforcement of his right by reason of some concealment or fraudulent conduct on the part of the defendant, or because of the defendant's failure to perform some legal duty whereby the plaintiff has been kept in ignorance of his rights," the plaintiff is excepted from the effects of prescription. *Gerard Lindquist*, 274 So.3d at 759 (citing *Carter v. Haygood*, 04-0646 (La. 1/19/05), 892 So.2d 1261, 1269). *See Fontenot v. Houston General Ins. Co.*, 467 So.2d 77, 80 (La. App. 3 Cir. 1985) ("employer who lulls an injured employee into a false sense

of security is estopped from interposing a plea of prescription to a worker's untimely suit for compensation benefits"). *See also Lomont*, 172 So.3d at 634-35.

Since Article 198 was enacted, no court has been called upon to address a biological father's delay in filing an avowal action in the face of the mother's statements that she had been intimate with her husband and was trying to make her marriage work. However, prior to the 2005 incorporation of dual paternity into the Civil Code, courts refused to find that a biological father's delay in filing an avowal action was unreasonable in "circumstances which impute[d] much of the delay to the mother." *T.D. v. M.M.M.*, 98-0167 (La. 3/2/99), 730 So.2d 873, 876-77, *abrogated by Fishbein v. State ex rel. Louisiana State Univ. Health Scis. Ctr.*, 04-2482 (La. 4/12/05), 898 So.2d 1260. *See Finnerty v. Boyett,* 469 So.2d 287, 292 (La. App. 2 Cir. 1985) (When the mother effectively causes the delay in the biological father's filing of an avowal action, the delay is not unreasonable so as to preclude avowal).

In *T.D. v. M.M.M.*, the mother informed the biological father that she suspected he was the father of the child. 730 So.2d at 874. Since she was not intimate with her husband at the time of conception, she also advised him of the child's paternity. *Id.* The biological father regularly visited the child and the mother during the years-long affair, and DNA testing confirmed his paternity to a 99.5% probability. *Id.* at 875. Once the mother and her husband divorced, the mother terminated her affair with the biological father and refused to allow him to see the child. *Id.* Finding that the father failed to file his avowal action earlier because he had regularly visited the child while in a relationship with the mother, the court held that the father's avowal action, filed six years after the child's birth, was not unreasonable.

Prior to 2005, while dual paternity was a jurisprudential rule, inconsistent applications sometimes stripped the legal father of his parental status when the

biological father's avowal was successful, likely creating havoc for the child in the face of losing a parent. *See* Louisiana House of Representatives, Civil Law Committee (4/5/2004), H.B. 368 *available at* https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2004/apr /0405_04_CL# (2:46:46-2:56:50) (referencing *Finnerty*, 469 So.2d 287). Yet, Louisiana courts were loath to strip the biological father of his right to parent, and the child of his or her right to know that parent, in the face of the mother's contribution to the filing delay. Today, when the application of Article 198 does not dispossess the legal father of his right to parent, but merely adds a parent, we are equally loath to find a biological father unreasonable in his actions under the facts of this case.

The trial court, relying upon two cases, found that Mr. Andrews' avowal action was filed more than one year after the day that he "certainly knew or should have known" of his paternity. In his oral reasons for judgment, the trial court quoted the following passage from *W.R.M. v. H.C.V.*:

> [t]he record reflects that W.R.M. was aware of the possibility that he was A.M.V.'s father from the moment that H.C.V. told him that she was pregnant, because of their ongoing sexual relationship. While there has been no determinative DNA testing, it is clear from the evidence and testimony that W.R.M. suspected from the beginning that A.M.V. was his biological son. . . . Despite these suspicions, W.R.M. did nothing to hold A.M.V. out as his son until [a later date].[26]

951 So.2d at 178 (as quoted by the trial court in its oral reasons for judgment on June 2, 2017). In that case, the biological father had an ongoing continuous relationship with the mother of over ten years but brought no avowal action until the child was almost nine years old. *Id.* The trial court also found *Suarez v. Acosta*, 15-750 (La. App. 5 Cir. 3/16/16), 194 So.3d 626, to be "right on point" in its interpretation of the statute. The biological father in that case received

---

[26] *W.R.M. v. H.C.V.* interpreted Article 191, the predecessor to Article 198. The only substantive difference in the two statutes is a two-year peremptive period from the birth of the child in Article 191, which was reduced to one year by the passage of Article 198. 06-0702 (La. 3/9/07), 951 So.2d 172, 174-75 & nn. 5-6 (Johnson, J., concurring).

knowledge of his paternity before the child was born but filed no avowal action until after the child's death, more than nine years later. *Id.*

Applying the law, the trial judge found that Mr. Andrews testified to an "ongoing and repetitive sexual relationship" with Ms. Kinnett that was exclusive in the sense that he believed she was sleeping in her daughter's room, not with Mr. Kinnett. The trial court further found that the timing of Ms. Kinnett's September 1, 2015 disclosure to Mr. Andrews was "strikingly close to the gestation period," and that Mr. Andrews, "in the back of his mind knowing that he could possibly be the father," did nothing, admitting that he did not ask Ms. Kinnett if the child was his. As reflected in the oral reasons for judgment, the trial court found Mr. Andrews was presented with sufficient facts during that conversation to, at the very least, excite his attention to the need for further investigation.

Although the trial court found that there was no evidence of bad faith deception by Ms. Kinnett, the court also opined that Mr. Andrews could not reasonably rely on Ms. Kinnett's statement that the baby was the result of her getting together with her husband one night. The trial judge stated,

> You've got an ongoing and repetitive sexual relationship with a woman and yet the testimony is a one-time encounter with her husband and you just naturally assume, it's not me, when, in fact, the likely probability is that one who has continued and repeated in intercourse is more than likely going to be the father of the child as opposed to [the one time encounter].

The record, however, does not support this interpretation of the facts.

The sporadic nature of Mr. Andrews' and Ms. Kinnett's relationship was uncontested. Mr. Andrews testified without contradiction that several weeks passed between intimate encounters at the height of the affair and became even more infrequent after Mr. Andrews began dating someone else. All parties agree that Mr. Andrews and Ms. Kinnett had a single sexual encounter during the month of November 2014, when G.J.K. was conceived. It is also uncontested that Mr.

Andrews did not see Ms. Kinnett in person for over a year thereafter and had only one communication with her between November, 2014 and September, 2015. Further, Mr. Andrews' testimony is also uncontradicted that he first discovered that Ms. Kinnett had been pregnant nearly a month after she had given birth, and she did not tell him the birth date.[27]

Upon the mother's bad faith deception, Article 198 requires the father to file his avowal action within one year from the day he knew or should have known *of his paternity*. La. C.C. art. 198. Paternity being the ultimate fact that gives rise to the cause of action for avowal, Mr. Andrews would have to have either "[d]irect and clear knowledge" of the fact that he was G.J.K.'s biological father or "[k]nowledge of information that would lead a reasonable person to inquire further." Undisputedly, no one clearly and directly informed Mr. Andrews of his paternity until Ms. Kinnett's December, 2016 DNA test result revelation.[28] The relevant question, then, is whether Mr. Andrews possessed information on September 1, 2015 sufficient to give him either reason to assume that he was

---

[27] The trial court's inference that Mr. Andrews should have assumed he was more likely the father than Mr. Kinnett is clearly erroneous as the most Mr. Andrews could have assumed was a fifty-fifty probability of paternity given Ms. Kinnett's statement that she slept with her husband once to conceive G.J.K. The uncontradicted evidence was that, it would have been Mr. Kinnett's one-time encounter versus Mr. Andrews' one-time encounter, setting aside other factors exclusively known by Ms. Kinnett, as discussed above.

[28] The trial court relied upon two February 23, 2017 text messages from Mr. Andrews to Ms. Kinnett to surmise that he might have had actual knowledge. The first message, read, "we do have to say you deceived me as to my paternity of the child, because if not, I don't have a claim. . .." Mr. Andrews testified that the message was his explanation of the petition's language to Ms. Kinnett because he was trying to maintain a romantic relationship with her, and she became upset that the petition cast her in a bad light. The trial court apparently rejected Mr. Andrews' explanation of the text stating, "[t]hose words do not suggest to me the idea of telling the truth," particularly because Ms. Kinnett's response was, "I did not deceive you. I had no idea. You will be lying if you say that." As addressed in detail above, Ms. Kinnett's claim that she "had no idea" was either untrue or simply wishful thinking.

The second text message from Mr. Andrews read, "I'm sorry things didn't work out differently between us back then. I feel responsible for the hell you're going through right now. I wish I would have whisked you away from a bad situation and we had had [G.J.K.] together. I am very sorry that I did not do that." The judge found "[t]hat clearly indicates that in previous time as it's written, you had knowledge, you had the ability to intervene and you didn't." However, Ms. Kinnett testified that she did not inform Mr. Andrews that he was G.J.K.'s father until December 9, 2016, because she believed Mr. Kinnett was the father until then, and because she wanted nothing more to do with Mr. Andrews. Given Ms. Kinnett's own testimony, it is difficult to discern how she would have conveyed to Mr. Andrews the probability of his paternity.

G.J.K.'s father or to excite his attention, put him on guard, and call for further inquiry.

Whether Mr. Andrews knew or should have known that he was G.J.K.'s father on September 1, 2015 depends on the facts available to him at that time, taking into consideration any effort by Ms. Kinnett to mislead him or conceal information that should be available through inquiry. Mr. Andrews testified that during their September 1, 2015 conversation she (1) told him the child was her husband's, (2) did not tell him the date the child was born or the child's age, and that he (3) did not know before then that Ms. Kinnett had been pregnant because he had not seen her since their last sexual encounter, (4) did not recall the date of that sexual encounter, and (5) knew that Ms. Kinnett had been using the NuvaRing® birth control device at the time of intercourse.

Mr. Andrews also testified that he had no reason to believe that Ms. Kinnett would lie to him about the child's paternity because he believed she was unhappy in her marriage and would prefer to be with him. Mr. Andrews would not have been unreasonable to assume that Ms. Kinnett was aware of the number of times she had slept with each man, whether or not she had properly used birth control during all of the relevant encounters, the date of her last menstrual cycle prior to conception, and the most likely date of ovulation and conception based on conversations she would have had with her obstetrician about the due date, i.e., whether Mr. Andrews was possibly her child's father.

In fact, while both parties testified to recognizing, at some point, that Mr. Andrews *could* be the father, the trial court conferred a "duty," "obligation," or "responsibility" upon Mr. Andrews to specifically ask Ms. Kinnett if the child was his, simultaneously rejecting the concept that Ms. Kinnett possessed superior knowledge of the facts—which required her to disclose the possibility of paternity

to Mr. Andrews—stating, "he was aware of that himself. That's his own testimony that it could have been his."

Upon review of the record, we find that the information available to Mr. Andrews after the September 1, 2015 conversation rendered his failure to file an avowal action within one year thereafter reasonable. Any apprehension or fleeting suspicion he may have had about his paternity upon learning that Ms. Kinnett had had a child was alleviated by her misrepresentations or insinuations that she knew her husband was the father.

Furthermore, assuming arguendo that Mr. Andrews' suspicions were awakened by Ms. Kinnett's statement that she had given birth, notice sufficient to trigger inquiry is tantamount to knowledge of everything to which a reasonable inquiry may lead. The trial court agreed that a reasonable inquiry would have been to simply ask the mother if she was sure about the paternity. Ms. Kinnett testified repeatedly that, on September 1, 2015, she had no doubt that her husband was her child's father. Therefore, by her own admission, she would merely have conveyed to Mr. Andrews her husband's paternity. As Ms. Kinnett, either directly or by insinuation, answered the question in the back of his mind, the trial court erred in attributing knowledge to Mr. Andrews beyond what asking that question would reveal. Mere apprehension of a fact does not trigger the running of the peremptory period. *Murray*, 280 So.3d at 630; *Powell*, 265 So.3d at 1187.

Moreover, the fact that a paternity test would have revealed the truth does not mean that Mr. Andrews was required to seek one. The fact that the information was available does not serve as constructive knowledge by itself. *See Gerard Lindquist*, 274 So.3d at 761. The paternity test demonstrates what Mr. Andrews *could* have known, not what he *knew or should have known*.[29] *See Id.*; *Campo,* 828

---

[29] To require the putative biological father to demand a DNA test based upon a mere apprehension of paternity flouts Louisiana's explicitly stated policy to preserve the intact family.

So.2d at 511-512. Unless there was enough information available to Mr. Andrews to strongly suggest to him that he *was in fact* the father of Ms. Kinnett's child, it would not have been reasonable for Mr. Andrews to interject himself into her marriage and seek a paternity test.

## CONCLUSION

For the reasons thoroughly discussed herein, we find that the trial court committed an error of law in placing the burden of proof on the exception of peremption upon Mr. Andrews rather than Mr. Kinnett, said error interdicting the fact finding process. Upon *de novo* review, we find that Mr. Kinnett failed to carry his burden of proving that Ms. Kinnett did not deceive Mr. Andrews in bad faith as to his possible paternity of G.J.K. We further find that, even if the trial court properly placed the burden upon Mr. Andrews, the trial court was manifestly erroneous in its finding that Ms. Kinnett did not deceive Mr. Andrews in bad faith as to his paternity of G.J.K., there being no factual basis for that finding. Further, the trial court committed an error of law in its interpretation of Civil Code art. 198's exception to the peremptory period when the trial court failed to recognize the mother's duty to inform the potential biological father of his possible paternity of her child. Finally, we find that the trial court legally erred in finding that a biological father who is aware of a mere possibility, rather than a probability, of paternity has a duty to investigate his possible fatherhood—especially when any such investigation would have been fruitless in the face of Ms. Kinnett's repeated statements that she believed Mr. Kinnett was the father of her child.

Therefore, for all of the reasons stated herein, on *de novo* review, we find that the trial court erred in finding that Mr. Andrews' avowal action was perempted. We find that Mr. Andrews' avowal action was timely filed on February 10, 2017, that date being less than one year from the date Mr. Andrews knew or should have known of his paternity on December 9, 2016. We hereby

reverse the trial court's June 2, 2017 judgment and remand this matter to the trial court for further proceedings consistent with this opinion. As this action renders it unnecessary for this Court to address the constitutional challenge to the statute, we pretermit discussion of Mr. Andrews' assignments of error regarding the trial court's ruling that Article 198 is constitutional.

**<u>REVERSED AND REMANDED</u>**

KAREN COHEN KINNETT

VERSUS

JARRED BRANDON KINNETT

NO. 17-CA-625

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

**WICKER, J., CONCURS WITH REASONS**

While we have resolved this case without addressing the constitutionality of Article 198, I write separately to point out my deep lingering concerns with the statute's constitutionality.

The question is whether Louisiana Civil Code art. 198 on its face and as applied by the trial court in this case violates Mr. Andrews' and the minor child's right to Due Process guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Louisiana Constitution.

As the opinion of this Court explains, when a statute can be interpreted two ways, one of which calls into question the statute's constitutionality, the court shall choose the interpretation that avoids the constitutional question. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371 (La. 7/1/08), 998 So.2d 16, 25, *amended on reh'g* (9/19/08); *Crown Beverage Co. v. Dixie Brewing Co., Inc.*, 96-2103 (La. App. 4 Cir. 5/28/97), 695 So.2d 1090, 1093, *writ denied*, 97-1711 (La. 10/13/97), 703 So.2d 615; *Bize v. Larvadain*, 18-394 (La. App. 3 Cir. 12/28/18), 263 So.3d 584, 592 (citing *State v. Lanclos*, 07-0082 (La. 4/8/08), 980 So.2d 643, 647-8), *reh'g denied* (2/13/19), *writ denied*, 19-0419 (La. 5/6/19),270 So.3d 577. Our interpretation of Article 198 does so by attempting to ensure that a biological father receives notice of his child's existence before being deprived of his opportunity to avow his child. *See* discussion *infra*, Section I.b. Thus, in interpreting the statute, we did not

address the argument—asserted by Mr. Kinnett and cited as partial justification for Article 198's limitation on an unwed father's right to avow[30]—that the biological father of a child whose mother was married to another man at the time of the child's birth has no constitutional rights to consider when assessing the statute's validity. I am of the opinion that Article 198 affects the fundamental rights of both the putative father and the child, and other interpretations of the statute would violate both the biological father's and the child's rights to due process.

Further, in Mr. Andrews' case, the deprivation has already occurred and every moment litigation remains pending increases the likelihood that the damage caused will become irreparable.

## I. Due Process

The Fourteenth Amendment to the United States Constitution promises that States will not "deprive any person of life, liberty, or property, without due process of law." Jurisprudence recognizes two components of due process: substantive and procedural. Substantive due process has been described as generally protecting individuals from arbitrary legislation. *Griswold v. Connecticut*, 381 U.S. 479, 502; 85 S.Ct. 1678, 1691; 14 L.Ed.2d 510 (1965) (Justice White, concurring); *Poe v. Ullman*, 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1961) (Justice Harlan, dissenting); *Babineaux v. Judiciary Comm'n*, 341 So.2d 396, 400 (La. 1976). While a variety of interests may require due process protection, substantive due process is usually satisfied if the government action is rationally related to a legitimate government interest. *Morales v. Par. of Jefferson*, 13-486 (La. App. 5 Cir. 4/30/14), 140 So.3d 375, 395, *writ denied*, 14-1293 (La. 10/10/14), 151 So.3d

---

[30] The Law Institute concluded, based on the United States Supreme Court's decision in *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S. Ct. 2333, 105 L Ed.2d 91 (1989), that "denying the biological father of a child the right to establish his filiation when another man was presumed to be the father was not unconstitutional." Katherine Shaw Spaht, *Who's Your Momma, Who are Your Daddies? Louisiana's New Law of Filiation*, 67 La. L. Rev. 307, 321-22 & nn. 94-96 (2007).

582, and *writ denied*, 14-1296 (La. 10/10/14), 151 So.3d 582, and *writ denied*, 14-1299 (La. 10/10/14), 151 So.3d 583.

However, certain interests, namely, those which are "deeply rooted in this Nation's history and tradition" and "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed,'" are ranked fundamental. *Washington v. Glucksberg*, 521 U.S. 702, 720-21; 117 S.Ct. 2258, 2268; 138 L.Ed.2d 772 (1997); *see Lawrence v. Texas*, 539 U.S. 558, 593; 123 S.Ct. 2472, 2491-92; 156 L.Ed.2d 508 (2003) (Scalia, Dissenting). Fundamental interests cannot be infringed upon by the government "*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993) (emphasis in original); *See Griswold*, 381 U.S. at 497 (Goldberg, J., concurring).

Procedural due process focuses on the essential fairness of the procedures a state has used to deprive someone of life, liberty, or property. *See Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 542; 97 S.Ct. 1932, 1957; 52 L.Ed.2d 531 (1977) (White, J., dissenting); *Babineaux*, 341 So.2d at 400. Among the requirements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Babineaux*, 341 So.2d at 400. The United States Supreme Court has recognized that the determination of the procedure required depends on the nature of the right or interest being threatened by the government. *See, e.g.*, *Lehr v. Robertson*, 463 U.S. 248, 256, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614 (1983). *See also Obergefell v. Hodges*, 135 S.Ct. 2584, 2631-32, 192 L.Ed.2d 609 (2015) (Thomas, J., dissenting).

Therefore, the threshold issue in any due process analysis is classifying the liberty interests at stake.

### a. *What Liberty Interest is at Stake?*

The United States Supreme Court has held that "a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N. C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159-60, 68 L.Ed.2d 640 (1981) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed. 551 (1972)). However, while the Court has stressed the "fundamental liberty interest of natural parents" in the parent-child relationship in the context of state-initiated proceedings to terminate parental rights, *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982), when discussing the interests of an *unmarried* biological *father* in the parent-child relationship, the Court has reached different conclusions about whether the interest is protected by the Due Process Clause based on the particular facts of the case. *Compr. Stanley*, 405 U.S. 645; *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Lehr*, 463 U.S. at 258; *and Michael H.*, 491 U.S. at 109.

In *Stanley v. Illinois*, an unmarried father's children became wards of the state upon the death of their mother, even though the father had lived with and raised the children and wished to retain custody. The Court found that Stanley's interest in his relationship with his children deserved protection, despite the fact that the relationship was not legitimated by marriage. *Stanley*, 405 U.S. at 651-52.

Similarly, in *Caban v. Mohammed*, an unmarried father's constitutional rights were violated by a statute that allowed an unmarried mother to block the adoption of her biological child by withholding consent, but did not allow an unmarried father to block the adoption in the same manner, even when his parental relationship was substantial. 441 U.S. at 385-87.

*Quilloin v. Walcott* dealt with a Georgia law that required the consent of each living parent before the adoption of a child who had been born into a marriage, regardless of the current marital status of the parents, but required only the consent of the mother for the adoption of a child born out of wedlock. 434 U.S. at 248. The Court held that the biological father's rights were not violated when he had never exercised actual or legal custody nor participated substantially in the daily responsibilities of rearing the children, and the trial court had found that the adoption of the child by the mother's husband was in the best interest of the child. *Id.* at 256.

In *Lehr v. Robertson*, the Court emphasized the difference between the developed parent-child relationship established in *Stanley* and *Caban* and the "inchoate" relationship evidenced in *Quilloin*. 463 U.S. at 249-50. The Court found,

> [w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," Caban, 441 U.S., at 392, 99 S. Ct., at 1768, his interest in personal contact with his child acquires substantial protection under the due process clause. . . . But the mere existence of a biological link does not merit equivalent constitutional protection.

*Lehr*, 463 U.S. at 261.

The Kinnetts argue that *Michael H. v. Gerald D.* is directly on point with the facts of this case. 491 U.S. 110 (1989). Gerald D.'s wife had an affair with Michael H., and a daughter was born of that relationship. Blood tests confirmed Michael's paternity within the first several months after the birth, and for the first three years of the child's life, Michael had a relationship with the child. When the mother kept Michael from seeing his daughter, he filed a paternity action. However, California law established a conclusive presumption that the husband of the mother was the father of any children born into the marriage, and Michael was denied standing to rebut the presumption.

The United States Supreme Court granted certiorari to address Michael's due process claims. Justice Scalia, writing for the plurality, emphasized the requirement that the "asserted liberty interest be rooted in history and tradition," and found no evidence that an "adulterous natural father's" right to assert "parental rights over a child born into a woman's existing marriage with another man" had ever received special protection. *Michael H.*, 491 U.S. at 122-25. Instead, he declared that the "presumption of legitimacy was a fundamental principle of the common law." *Id.* at 125 (citing H. Nicholas, Adulturine Bastardy 1 (1836)). The historical policy behind the conclusive presumption was predominately "an aversion to declaring children illegitimate, thereby depriving them of rights of inheritance and succession, and likely making them wards of the state." *Id.* (internal citations omitted). However, he pointed out that a secondary concern was promoting the "peace and tranquility of states and families." *Id.*

Therefore, although the Court had recognized six years earlier, "[t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring," *Lehr*, 463 U.S. at 257-58, the plurality in *Michael H.* held that when the child is born into a marriage, "the natural father's unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the State to give categorical preference to the latter." 491 U.S. at 128-29.

The plurality conclusion in *Michael H.* is troubling for a number of reasons. The short opinion opened with a narrow description of the right Michael H. actually asserted and then analyzed whether that right, as defined by the author, found protection in our nation's history and traditions. Justice Scalia's rationale fails to appreciate fully the historical foundation for the Fourteenth Amendment and this nation's unfortunate tradition of denying rights to certain categories of

individuals.  The Fourteenth Amendment extended rights and protection of the law to individuals who had previously been categorically denied protection.

Only Chief Justice Rehnquist "endors[ed] Justice Scalia's view of the proper method of analyzing questions arising under the Due Process Clause."  *See Michael H.*, 491 U.S. at 136 (Brennan, J., dissenting).  Justices O'Connor, Kennedy, and Stevens concurred, agreeing with the outcome in this particular case but not with the analysis, decrying Justice Scalia's method of analyzing history and tradition to determine whether Michael H. had a fundamental liberty interest at stake.  *Id.* at 132 (O'Connor, J., concurring in part).  Justice Stevens questioned Justice Scalia's seeming rejection of "the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to, and cohabiting with, another man at the time of the child's conception and birth."[31]  *Michael H.*, 491 U.S. at 133 (Stevens, J., concurring).

Justices Brennan, Marshall, Blackman and White, in dissenting, agreed not only that the natural father has a constitutionally protected liberty interest in a relationship with his child, but also that the California statute unconstitutionally terminated Michael H.'s protected liberty interest in the parent-child relationship without "the least bit of process."  *See id.* at 136, 151 (Brennan, J., dissenting).  Justice White, with Justice Brennan agreeing, opined further that Michael H. was provided notice but no real opportunity to be heard as the California statute unconstitutionally refused him the opportunity to rebut the State's presumption that the mother's husband was the father of the child through blood test evidence.  *Id.* at 161 (White, J., dissenting).

---

[31] Justice Stevens agreed with the outcome because the trial judge had the authority to grant Michael H. reasonable visitation rights as an "other person having an interest in the welfare of the child."  Therefore, although Justice Stevens was willing to assume that Michael H. had a constitutional right, he believed that the California statute satisfied due process.  *Id.* at 133-34, 136 (Stevens, J., dissenting).

Rigid focus upon history and tradition is inconsistent with a rich body of United States Supreme Court jurisprudence that predates the *Michael H.* decision and fails to consider that both history and tradition are a side effect of the passage of time and evolving social mores. Many of the substantive due process rights now considered to be "implicit in the concept of ordered liberty" such that to abolish them violates "a principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental" were once explicitly denied protection under the Fourteenth Amendment. *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) (citing *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)) (The Fifth Amendment double jeopardy clause was not a fundamental principle of liberty and due process such that it was applicable to the states through the Fourteenth Amendment); *But see Benton v. Maryland*, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969) (finding, "[t]he fundamental nature of the guarantee against double jeopardy can hardly be doubted" and extending the prohibition against double jeopardy to the states through the Fourteenth Amendment thirty-two years after the *Palko* decision).

Supreme Court jurisprudence addressing a plethora of asserted rights affirms that history and tradition are not the sole arbiters of whether liberty interests are entitled to protection under the constitution in the face of evolving science and societal norms. *See e.g. Lawrence v. Texas*, 539 U.S. at 572. In *Lawrence v. Texas*, the Supreme Court relied upon no historical evidence of protection for individuals engaging in homosexual intercourse to strike down a Texas statute criminalizing consensual homosexual sex. *Id.* On the contrary, the Court acknowledged that homosexual conduct had been condemned as immoral for centuries. *Id.* at 571. Instead, the majority looked to the laws and traditions of the "past half century" to find an "emerging awareness that liberty gives substantial

protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex." *Id.* at 571-72. Seventeen years earlier, in a five-to-four decision, the Supreme Court refused to construe the Constitution to confer "a right of privacy that extends to homosexual sodomy." *Bowers v. Hardwick*, 478 U.S. 186, 190-92, 106 S.Ct. 2841, 2843, 92 L.Ed.2d 140 (1986), *overruled by*, *Lawrence v. Texas*, 539 U.S. at 558.

In *Obergefell v. Hodges*—rather than viewing the right to same-sex marriage through the lens of history and tradition—the majority looked to the changing nature of the institution of marriage and American society as well as its own evolving *stare decisis* to find that the traditional denial of the right to marry to same-sex couples violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *See* 135 S.Ct. at 2602-05. Forty-three years earlier, in 1972, the United States Supreme Court dismissed an appeal from a decision of the Minnesota Supreme Court holding that statutes prohibiting same-sex marriages did not violate the Constitution. *Baker v. Nelson*, 409 U.S. 810, 93 S.Ct. 37 (Mem), 34 L.Ed.2d 65, (1972). The appeal was dismissed "for want of a substantial federal question." *Id.*

Likewise, Justice Scalia's description of the liberty interest at stake in *Michael H.*, in terms of whether the child's mother was married to the biological father or another man at the time of conception and birth, is not consistent with the practice of determining whether the interest is implicit in the concept of ordered liberty or one that has found protection in the history and traditions of our people. Justice White, dissenting in *Michael H.* and *Lehr*, emphasized that relying on the particular facts of a case to determine whether the father has a protected interest is untenable. *See Michael H.*, 491 U.S. at 157-58 & n.1; *Lehr*, 463 U.S. at 268 ("As Jessica's biological father, Lehr either had an interest protected by the Constitution or he did not.").

Furthermore, the dissenting Justices seemed to recognize that historical justifications for failing to protect the biological father's interest in his child born to a married woman no longer exist. Justice Brennan's dissenting opinion in *Michael H.* pointed out that

> the original reasons for the conclusive presumption of paternity are out of place in a world in which blood tests can prove virtually beyond a shadow of a doubt who sired a particular child and in which the fact of illegitimacy no longer plays the burdensome and stigmatizing role it once did.

*Michael H.*, 491 U.S. at 140.

Without question, the parent-child relationship is a fundamental right that has historically been entitled to protection under the Fourteenth Amendment. *See Meyer v. Nebraska*, 262 U.S. 390, 400; 43 S.Ct. 625, 627; 67 L.Ed. 1042 (1923) (describing the corresponding rights and duties between parents and children); *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 536; 62 S.Ct. 1110, 1111; 86 L.Ed. 1655 (1942) (the right to have offspring is "one of the basic civil rights of man."); *Prince v. Massachusetts*, 321 U.S. 158, 166; 64 S.Ct. 438, 442; 88 L.Ed. 645 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

Likewise, children have corresponding constitutional rights to the parent-child relationship. *See, e.g.*, *Santosky*, 455 U.S. at 760-61 ("until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship."). Yet, courts and legislatures often use the child's best interest as justification for refusing protection to the relationship between the biological father and the child. *See, e.g.*, *Quilloin*, 434 U.S. at 255 ("we cannot say that the State was required . . . to find anything more than that the adoption, and denial of legitimation, were in the 'best interests of the child.'").

The State of course must consider the child's interest in having basic needs met as well as the child's mental, physical, and emotional well-being to control the outcome of many cases involving children. *See, e.g.*, *Tracie F. v. Francisco D.*, 15-224 (La. App. 5 Cir. 9/21/15), 174 So.3d 781, 794. However, if a child's interest in developing and preserving this all-important and unique relationship— which, according to the State, is usually in the child's best interest[32]—is fundamental, then the foreclosure of that right cannot occur without due process of law.[33] Where fundamental rights are at stake, due process is satisfied only when the government has a compelling interest that justifies infringing upon the right, and the law employs the least restrictive means to achieve the government's objective. *See, e.g.*, *State v. Perry*, 610 So.2d 746, 760 (La. 1992).

As will be discussed below, some of the state's originally stated interests justifying Article 198 are no longer compelling. Also, while the best interest of the child is a major consideration, this standard does not adequately protect the fundamental rights of both the biological father and the child when the issue is whether the father may avow the child. Furthermore, Article 198 eliminates even the minimal process that a hearing on the best interest of the child would provide, unduly burdening the right to the parent-child relationship.

## 1. History of the Marital Presumption

Historically, children needed protection not only from the social stigma of illegitimacy but also from the harsh legal consequences of being labeled illegitimate. *See Smith v. Cole*, 553 So.2d 847, 849 (La. 1989). In an effort to

---

[32]*See Troxel v. Granville*, 530 U.S. 57, 68, 120 S.Ct. 2054, 2061, 147 L.Ed.2d 49 (2000) (constitutional law historically recognized that "natural bonds of affection lead parents to act in the best interests of their children.") (quoting *Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979)); Spaht, supra, at 315 (describing the preference for children being raised by biological parents united in marriage); *Tracie F.*, 188 So.3d at 242-43 (recognizing a preference for biological parents in custody determinations).

[33] The child also has other interests at stake including an interest in knowing his biological father's ancestors, medical history, and genetic traits and an interest in knowing that his father wants to be involved in his life.

promote marriage, fidelity, and "legitimate family relationships,"[34] the Civil Code developed a complex system to regulate family life, which included classifying children based on the circumstances of their birth and assigning varying rights and degrees of protection based on those classifications. *See, e.g., id.; Succession of Robins*, 349 So.2d 276, 282 (La. 1977) (Summers, J., dissenting) ("Stability of the family and certainty of property rights are sought to be protected by the Civil Code. So interrelated with this purpose is the treatment of illegitimate children that our courts have declined attacks upon the elaborate plan regulating family life embodied in the Code.").

For example, for purposes of inheritance, legitimate children were afforded greater rights than illegitimate children, and some illegitimate children were prohibited from receiving property from their natural parents by any means. *See id.* at 277. On its face, the law of legitimacy was concerned with biological fact. The term "legitimate" included only those children who were conceived during the marriage of their *natural* parents. *Succession of Robins*, 349 So.2d at 282. The category of illegitimate children included both children born to persons who, at the time of conception, could have legally married, and children born to persons who could not marry at the time of conception because of some legal impediment. *Id.* Both "adulterous bastards"[35] and "incestuous bastards" were expressly defined by the law as members of the latter category of illegitimates. *Id.* Furthermore, the law prevented children who were considered illegitimate because they were born of adultery or incest from becoming legitimate through parental acknowledgment. *See Weber*, 406 U.S. at 167 n.3, 171 & n.9.

---

[34] *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 173, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768 (1972) (Louisiana asserted interest in protecting "legitimate family relationships" as justification for denying illegitimate children workmen's compensation benefits at father's death).

[35] Former Civil Code art. 182 defined "adulterous bastards" as "those produced by an unlawful connection between two persons, who, at the time when the child was conceived, were, either of them or both, connected by marriage with some other person." *Id.* at 282-83.

The harsh consequences of illegitimacy were designed to promote marriage and discourage extramarital affairs. *See, e.g.*, *Succession of Robins*, 349 So.2d at 278 ("valid state purpose said to be served is to help preserve the sanctity of the marriage by penalizing adulteries"). However, the need to protect innocent children from those consequences, combined with the difficulty of proving paternity, resulted in strict application of the marital presumption.[36] *See, e.g.*, *Tannehill v. Tannehill*, 261 So.2d 619, 623 (La. 1972).

In its first manifestation in Louisiana law, neither the "wife's adultery nor the allegation of the husband's natural or accidental impotency" could rebut the presumption. *T.D. v. M.M.M.*, 730 So.2d at 880 (Kimball, J., dissenting), *abrogated by Fishbein v. State ex rel. Louisiana State Univ. Health Scis. Ctr.*, 04-2482 (La. 4/12/05), 898 So.2d 1260 (citing Title VII, Chapter II, art. 7, Civil Laws of the Treaty of Orleans (1808). Between 1870 and 1976, the husband of the mother was prohibited from disavowing the child because of his wife's infidelity unless the birth was concealed from him. *Id.* at 881. In other words, in Louisiana, just as in the common law referenced by Justice Scalia in *Michael H.*,[37] the presumption could be rebutted only when it was virtually certain that the husband of the mother was not the biological father. *See T.D. v. M.M.M.*, 730 So.2d at 880; *Tannehill*, 261 So.2d at 622 (presumption of paternity did not arise when the child was born before the 180th day of the marriage, when the child was born more than 300 days after dissolution of the marriage or judgment of separation, or when the husband was so remote from the wife that cohabitation was physically impossible).

---

[36] The marital presumption was also intended to recognize and protect biological fact by placing the presumption of paternity on the man most likely to be the biological father of a child and eliminating the need for case-by-case determination of paternity. *See* Spaht, *supra*, at 318 (recognizing the same logic applied to new presumptions of paternity in the 2005 revisions to the law of filiation, i.e. that subsequent marriage to the mother is evidence of a man's belief in biological paternity). The marital presumption relied on a further presumption that a married woman complied with her obligation of fidelity. *Id.*; *see* La. C.C. art. 98 cmt. (b); La. C.C. art. 185.

[37] *See Michael H.*, 491 U.S. at 122-25.

In reality, however, the presumption also served to circumvent the law's intended consequences for infidelity by shielding children born of a woman's extramarital affair from the label and stigma of illegitimacy and forcing some husbands to support and legitimize their wives' illegitimate children.[38] *Smith v. Cole*, 553 So.2d at 850; Rachel L. Kovach, *Sorry Daddy—Your Time is Up: Rebutting the Presumption of Paternity in Louisiana*, 56 LOY. L. REV. 651, 653 (2010). While the law defined all children born of extramarital affairs as "illegitimate," a child born as a result of a married woman's affair was protected by the marital presumption. *Succession of Robins*, 349 So.2d at 279.

As seen in *Smith v. Cole*, instead of penalizing extramarital affairs, the presumption could also insulate biological fathers from the responsibility of having children. 553 So.2d at 847. Mr. and Ms. Smith physically separated before Ms. Smith had a child with Mr. Cole but did not divorce until years later. *Id.* at 848. Ms. Smith brought a filiation and support action against the biological father, Mr. Cole. *Id.* Mr. Cole argued that the child was the legitimate child of Mr. Smith—as Mr. Smith had not formally disavowed her—and that Ms. Smith should not be allowed to "bastardize" the child to obtain money. *Id.* at 849.

As various unintended consequences of the law came to light, what was once a nearly irrebuttable presumption gave way to actions allowing proof of actual paternity. In 1976, revisions to the Civil Code granted the husband the ability to rebut the presumption by proving that the child was not his biologically. *Id.* at 881. Around the same time, United States Supreme Court jurisprudence on the constitutional rights of illegitimate children prompted the Louisiana Supreme

---

[38] The fact that the presumption served to protect children that the law intended to suffer the consequences of their parents' choices is not lamentable. The United States Supreme Court correctly decided that such discrimination against innocent children cannot be justified by the State's desire to force adults to conform to certain social standards. *See, e.g., Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 1464-65, 52 L.Ed.2d 31 (1977).

Court to recognize dual paternity. *Warren v. Richard*, 296 So.2d 813, 816-17 (La. 1974).

As it became clear that the State's interest in promoting and protecting certain family values could not justify discrimination against illegitimate children, the need to protect children from the stigma and legal consequences of illegitimacy was diminished. *Smith v. Cole*, 553 So.2d at 850 & n.4; *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968); *Weber,* 406 U.S. 164. Today, single-parent homes, stepfamilies, and divorce are commonplace, and neither divorce nor illegitimacy carries the stigma that it once did. *See T.D. v. M.M.M.*, 730 So.2d at 878 (Knoll, J., concurring); Mary Kay Kisthardt, *Of Fatherhood, Families and Fantasy: The Legacy of Michael H. v. Gerald D.*, 65 Tul. L. Rev. 585, 641 (1991).

The Louisiana marital presumption's evolving path illustrates that history and tradition must sometimes give way to truth gained from experience, science, and technology. When the social and legal consequences associated with illegitimacy were dire, and the only actual proof of paternity was long absence, the State's interest in providing protection for innocent children was compelling, whether or not the method of providing protection was wholly effective. Today, when the evolution of the law and society has rendered the protection of the child from negative social and legal consequences unnecessary, and scientific advances make proof of paternity a simple scientific reality, the State's interest in protecting children no longer justifies the maintenance of legal fiction in the face of biological fact.

The marital presumption and its purposes no longer justify denying the existence of a biological father's constitutional right to parent.

## 2. Louisiana Law–Right to Avow

Mr. Kinnett, relying upon the plurality's reasoning in *Michael H.,* argues that a biological father has no parental rights unless his petition to avow his child is successful, and the legal relationship between biological father and child is recognized. *See supra* note 30. However, the Louisiana Supreme Court has distinguished between the right that "flows from the [biological] fact of parenthood," and the "possibility of a subsequent forfeiture of parental rights through abandonment or neglect." *See, e.g.*, *Maxwell v. Leblanc*, 434 So.2d 375 (La. 1983) (unwed biological father had a natural right to visitation with his child); *Deville v. LaGrange*, 388 So.2d 696, 697-98 (La. 1980) (unwed biological father had a "paramount" right to custody of his child). Thus, to protect his interest in the parent-child relationship, the biological father may be required to "demonstrate[] his fitness for parental responsibilities, commitment to those responsibilities, concrete actions taken to grasp his opportunity to be a father, and the potential for him to make a valuable contribution to the child's development." *See Matter of R.E.*, 94-2657 (La. 11/9/94), 645 So.2d 205, 207-08 (citing *In re Adoption of B.G.S.,* 556 So.2d 545 (La. 1990)).[39]

However, the Louisiana Supreme Court rejected the concept that only biological fathers with a "fully developed relationship" with their children possess a constitutionally protected interest in parenthood. *B.G.S.*, 556 So.2d at 550-51. *See also State in the Matter of R.E.*, 642 So.2d 889 (concurrence emphasizing that the father had never had the opportunity to meet his child or develop a substantial relationship where the mother surrendered the child days after the birth); *Lehr*, 463 U.S. at 271 (dissent pointing out that the biological father would have developed a substantial relationship with his child if the mother had not hidden the child's

---

[39] *But see infra* note 15 (mothers' constitutional rights are entitled to protection without such demonstrations).

whereabouts from him). Relying upon the line of United States Supreme Court cases discussed *supra*, pp. 47-50, the Court found that a biological father has "cognizable constitutional rights to parenthood," *In re A.J.F.*, 764 So.2d at 57, when he has "dedicated himself to his paternity when there is yet time for him to make a valuable contribution to the child's development." *B.G.S.*, 556 So.2d at 550, 553 (*quoting Lehr*, 463 U.S. at 261-62.)[40] Therefore, a "fully committed unwed father of a newborn child has a constitutionally protected interest in his opportunity to develop a mutually beneficial emotional or psychological bond with his child" which is "defeasible if not preserved by dedicated, opportune fatherly action." *Id.* at 550.

The "interest of a biological parent in having an *opportunity* to establish a relationship with his child is one of those liberties of which no person may be deprived without due process of law under our state constitution."[41] *B.G.S.*, 556 So.2d at 550, 553 (La. 1990) (*quoting Lehr*, 463 U.S. at 261). The constitutionally protected interest does not cease to exist when the biological father's child is presumed to be the child of another man. *Finnerty*, 469 So.2d at 292 (The "biological relationship does entitle a natural father to at least some opportunity to develop a personal relationship with his child, and thus to assume a responsible role in the future of his child."). *See Smith v. Jones*, 566 So.2d 408, 413 (La. Ct. App. 1990), *writ denied sub nom. Kemph v. Nolan*, 569 So.2d 981 (La. 1990) (denying the biological father the right to avow paternity also denied him of his opportunity to establish a relationship with his child, which, according to the

---

[40] The Court examined whether a State through private adoption statutes may allow a mother of an illegitimate child to terminate the parental rights of the unwed father without notice and opportunity to be heard.

[41] Recognizing that the "reciprocal rights and obligations of natural parents and children" are included among the individual rights discussed in Article 1, section 24 of the Louisiana Constitution, which provides that the "enumeration in this constitution of certain rights shall not deny or disparage other rights retained by the individual citizens of the state." *B.G.S.*, 556 So.2d at 551.

relevant precedent, he was obliged to take advantage of in order to have his parental rights protected under the constitution).

The relevant question is whether Article 198's procedure for terminating the right of a biological father to avow his child—the peremptory periods—satisfies the requirements of due process.

### b. *What Process is Due?*

Due process requires that a person whose rights may be affected by state action must be notified because he is entitled to be heard. *B.G.S.*, 556 So.2d at 554. Once the court determines that the nature of the interest threatened is constitutionally cognizable, proper evaluation of the state's process involves weighing the importance of the private and public interests at stake. *Id.* Due process requires "some kind of hearing;" just what kind of hearing must be determined by balancing the factors set out in *Mathews v. Eldridge,* 424 U.S. 319, 321; 96 S.Ct. 893, 901-03; 47 L.Ed.2d 18 (1976). *Wilson v. City of New Orleans*, 479 So.2d 891 (La. 1985).

The factors include (1) the "private interest that will be affected by the official action;" (2) the "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3), the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S at 334-35.

The private interest affected by the government action in this case is both constitutionally cognizable and significant.[42] Depriving the biological father of the right to avow his child terminates *all* of his parental rights, including the most basic right of parenthood, custody or visitation. *Smith v. Jones*, 566 So.2d at 412

---

[42] The state action in this case is the establishment of peremptory periods that presume one year from the date of birth of the child is a reasonable amount of time for a man to seize his opportunity to preserve his parental rights in every situation (except one). La. C.C. art. 198.

("If a natural father has no right of action by which he can have the biological parent-child link legally recognized, then there is no link, in the eyes of the law, that could serve as a basis for granting visitation.") (quoting *Finnerty*, 469 So.2d at 292); *See Michael H.*, 491 U.S. at 148-49 (Brennan, J., dissenting) (a biological father who has been prevented from asserting his paternity cannot benefit from the legal presumption that a *parent* is entitled to visitation rights unless the visitation would be detrimental to the best interests of the child).

However, the biological father is not simultaneously relieved of the responsibilities and obligations of parenthood. *See id.* at 413-14; *T.D. v. M.M.M.*, 730 So.2d at 876. It is the fact of biological paternity or maternity that obliges parents to support and nourish their children. *Smith v. Cole*, 553 So.2d at 854. Therefore, denial of the biological father's right to parent does not prevent the child's mother or the State from establishing paternity for purposes of child support. *See Id.* at 854-55. Conversely, filiation entitles an otherwise deprived child to wrongful death benefits and inheritance. *See Smith v. Jones*, 566 So.2d at 413.

The biological father's constitutional rights to parenthood are not unfettered. The biological father must nurture those rights or risk losing them. Although a biological father has cognizable constitutional rights to parenthood by virtue of his biological relationship to the child, "a biological father *who knows or has reason to know* of the existence of his biological child and who fails to assert his rights for a significant period of time[] cannot later come forward and assert paternity." *See, e.g.*, *Smith v. Jones*, 566 So.2d at 414. When parental rights are at stake, courts have been reluctant to terminate those rights for reasons short of abandonment or unfitness. *See, e.g.*, *Deville*, 388 So.2d at 698; *Santosky*, 455 U.S. at 753. This implies that a man must first know or have reason to know of the existence of his

child before his right to the opportunity to develop a relationship may be eliminated by the mere passage of time and operation of law.

Article 198 risks an erroneous deprivation of the biological father's interest because the statute does not consider whether the biological father has received notice of, not only the upcoming expiration of his parental rights, but first of the child's very existence before his time to develop a relationship lapses. Also, Article 198's bad faith exception may be too narrow to adequately protect the biological father's rights. When constitutionally protected interests are affected by government action, due process requires "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *B.G.S.*, 556 So.2d at 554 (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950)). To protect his rights, Article 198 requires Mr. Andrews to rely upon Ms. Kinnett's good will to timely inform him of his possible paternity, in the face of her conflicting interest.

Mr. Kinnett seeks to distinguish *B.G.S.* and other cases involving the biological father's right to notice and a hearing before termination of parental rights and subsequent adoption of the child, arguing such notice is constitutionally required only when the mother seeks to terminate her parental rights. *See generally id.*; *In re A.J.F.*, 764 So.2d 47; La. Ch.C. art. 1132-36 (requiring notice to alleged or adjudicated father when the mother of a child born outside of marriage surrenders the child for adoption).[43]

---

[43] The adoption cases are distinguishable to the extent that the adoption process involves state action whereas the filiation process does not. Article 198 permits the state to assume that Mr. Andrews had no parental rights, merely the opportunity to seek them. By finding that the unwed biological father has fewer rights than the mother—the courts have created a situation in which the *state* did not deprive Mr. Andrews of his *opportunity* to develop a meaningful relationship with his son, Ms. Kinnett did.

The legislature has statutorily determined the reasonable time for a biological father to seize his constitutionally protected opportunity and presumed that a failure to avow within that time period constitutes a *knowing* waiver of parental rights, creating a legal fiction.

However, the adoption cases and the dual paternity cases both base their holdings on the premise that due process requires that the biological father must have the opportunity to assert his right to parenthood. In cases in which the mother voluntarily relinquishes her rights to the child, diligent effort must be made to discover the identity of the biological father if the mother does not reveal it. *See In re A.J.F.*, 764 So.2d at 56. The mother's failure to identify a potential biological father or misattribution of paternity to someone other than the actual father can result in an annulment of the adoption by fraud. *Id.*; *Thompson v. Cavanaugh*, 688 So.2d 1259 (La. App. 3 Cir. 1997).

Article 198, on the other hand, operates to terminate a biological father's parental rights whether or not he even knows such rights exist. As discussed above, the court considers whether the father knew or should have known that his child existed only when there is proof that the mother in bad faith deceived the biological father as to his paternity. Article 198, like the statute found to have deprived the father of due process in *B.G.S.*, allows the child's mother "to decide whether the natural father shall be notified or consulted prior to the termination of his interest." *B.G.S.*, 556 So.2d at 553.

The *B.G.S.* court found that the statute, which depended on the child's mother to provide notice to the biological father that his parental rights were subject to termination, also deprived the biological father of a neutral decision maker, as required for due process. *Id.* at 555. The court there pointed out that the mother could hardly be considered neutral, as she and the father potentially had adverse interests, as in this case. *Id.* at 555.

Article 198's requirement that the mother engage in bad faith deceit to trigger the extended peremptory period and its silence as to the party bearing the burden of proof on that issue may, in the face of the mother's mere silence for over one year from the child's birth, place the biological father in the impossible

position of proving bad faith with no evidence whatsoever of the mother's intent. The Louisiana Supreme Court in *B.G.S.* stated, "the lack of a hearing, combined with the placement of decision in the hands of a potentially adverse decision maker, violates the most basic principles of due process under both our state and federal constitutions." *Id.* at 556.

The third *Mathews* factor analyzes the government's interest, including any additional burdens that would be caused by additional or substitute procedural requirements. As discussed in this Court's opinion, the Law Institute had several objectives when drafting the legislation that eventually incorporated Article 198, including more closely aligning biological and legal paternity. Spaht, *supra*, at 314 *see* Louisiana House of Representatives, Civil Law Committee (4/5/2004), H.B. 842 *available at* https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2004/apr/0405 _04 _CL# (58:00:00- 1:06:20) (discussion of proposed Articles 186, 196, and 197 emphasizing the intention to align filiation and biological paternity).

Acknowledging that the proposed legislation involved the interests of multiple parties, the drafters attempted to fairly balance and protect the interests of all parties affected by the law. *See, e.g.*, Spaht, *supra*, at 311-13.[44] However, with respect to Article 198, the drafters attributed no constitutionally protected interests to the biological father. *See supra* note 30. The constitutional rights of the mother and the presumed father (both the right to marital privacy and parental rights) were weighed along with the child's interests, which include constitutionally protected

---

[44] With respect to proposed Article 186—wherein a child born within 300 days from the termination of a marriage was presumed to be the first husband's child, but upon disavowal, if the mother had remarried, the second husband became the child's presumed father—protection of the interests involved depended on notice. *Id.* at 311-12. To ensure that the second husband was given notice of the effect the first husband's disavowal action might have on him, the law required that the second husband be made a party to the first husband's disavowal action. *Id.* While Article 186 requires notice to other potential fathers, Article 198 does not.

interests such as the right to care, custody, and support. *See* discussion *supra* pp. 54-55.

According to Professor Spaht, "the interest of the child demands resolution of its paternity within a reasonable period of time." Spaht, *supra*, at 313. Furthermore, the requirement that the biological father act quickly to institute an avowal action "is intended to protect the child from the upheaval of such litigation and its consequences in circumstances where the child may actually live in an existing intact family with his mother and presumed father or may have become attached over many years to the man presumed to be his father." La. C.C. art. 198 cmt. (e). The stated purpose of the peremptory period includes the State's interest in promoting and protecting its preferred definition of family. *See supra*, note 18.

According to research relied upon by the Law Institute when drafting Article 198, "on average a child who is reared in the home of his or her biological parents united in marriage prospers in ways unattained by children reared in other family structures." Spaht, *supra*, at 315. However, in the absence of the ideal situation, a two-parent household is generally preferable (provided the parents are married and regardless of whether a biological connection exists). *See, e.g.*, *Stanley*, 405 U.S. 645. Finally, the State desired, above all, that a child be filiated to someone. *See* Spaht, *supra*, at 315-16 ("The mother may not contest the paternity of her husband if the biological father is unwilling to marry the mother or if the biological father is unknown" because the result would be to "bastardize" her child.).

Therefore, no peremptory period exists as to the biological father's right to avow when the child has never been filiated to anyone. However, when a child is born into a marriage, the law creates barriers to acknowledging biological truth. While the state's interest in protecting the child is important, Article 198's peremptory period is not so sufficiently related to achieving that interest that it outweighs the risk of erroneous deprivation of the biological father's

constitutionally protected interest in an opportunity to develop a relationship with his child.

The fact that a marriage still exists between a child's mother and presumed father does not necessarily mean that an intact family exists, at least not in a way that will nurture the child's interest in a stable and loving home environment. As in *Smith v. Cole*, the presumed father may simply abandon the relationship with the child without going through the disavowal process. 553 So.2d at 848. Then, while the presumption remains, the child is not part of an intact family and has, in fact, lost the parent-child relationship that may have formed over many years.

Furthermore, the "upheaval" contemplated by the legislature depends on there being either an existing intact family involving both the mother and presumed father or a relationship with the presumed father that developed over many years. La. C.C. art. 198 cmt. (e). The upheaval referred to is not just the avowal litigation itself, but the revelation that the man a child has believed to be his biological father is not, and the resulting introduction of a new paternal figure in the child's life. As a practical matter, the upheaval can occur without an avowal action. Nothing prevents the biological father from asserting his paternity outside of court, and nothing limits the time within which he can do so. A phone call may throw the marriage and the family into disarray, causing further upheaval to the child's home in the form of divorce proceedings or marital strife. *See Michael H.*, 491 U.S. at 155 n.11 (Brennan, J., dissenting).

Article 198, as it was interpreted and applied by the trial court in this case, permits the mother—whose interest conflicts with the biological father's—to deprive the father of parental rights by silently engaging in wishful thinking that her husband is the father of her child in the face of evidence that her paramour is equally likely to be the child's father. The trial court's interpretation and application of Article 198 in this case is more likely to increase the upheaval

caused by litigation and its consequences by requiring men to file avowal actions at the earliest suspicion of paternity, in spite of any evidence which tends to refute the suspicion (including the mother's statements to the contrary). *See supra* pp. 41-42 & n. 29. This interpretation may cause unnecessary upheaval of a child's life. However, the fact that Article 198 allows for dual paternity potentially decreases the risk of upheaval if all parties consider the best interests of the child first. Unlike the California law at issue in *Michael H.*,[45] avowal actions pursuant to Articles 197 and 198 do not affect the presumed father's legal status. La. C.C. art. 192 cmt.

In this case, none of the state's interests were served by denying Mr. Andrews the right to avow his biological child. When Mr. Andrews filed his petition to establish paternity, there was little to no risk of upheaval to the child because there was no intact family[46] and, as G.J.K. was under age two, no relationship of *many years* existed between G.J.K. and his presumed father. At the time the avowal action was filed, Mr. Andrews had been introduced to his son and had begun spending time developing a relationship. At age eighteen months, the child was young enough to introduce another parental figure into his life without detrimental upset or confusion. Growing up with two fathers could be less disruptive to the child's life than the divorce of his parents and the subsequent remarriage or cohabitation of one or both of those parents with step-parents. *See Michael H.*, 491 U.S. at 162 (White, J., dissenting) ("It is hardly rare in this world of divorce and remarriage for a child to live with the 'father' to whom her mother is married, and still have a relationship with her biological father.").

---

[45] *See Michael H.*, 491 U.S. at 130.
[46] The Louisiana Supreme Court has stated, "once the bonds of matrimony are dissolved by divorce, the State's interest in preserving the marital family disappears." *See Gallo v. Gallo*, 03-0794 (La. 12/3/03), 861 So.2d 168, 174 (citing *T.D. v. M.M.M.,* 730 So.2d at 878 (concurring opinion)).

The trial court in this case also referred to the state's interest in "protecting the status of a child vis-á-vis his mother and father, his family, his classmates, and the world."[47] However, neither denying nor granting Mr. Andrews' avowal petition alters the child's status. If the court had declared Mr. Andrews to be G.J.K.'s biological father, G.J.K. would legally remain the legitimate child of the Kinnett marriage. Conversely, denying Mr. Andrews' avowal of G.J.K. does not change the fact that G.J.K. is Mr. Andrews' illegitimate child born to a married woman. *See* discussion *supra* pp. 55-57. Nor does the state's steadfast refusal to acknowledge biological fact prevent the child from learning of his biological paternity in the future, although he may suffer more if deceived for years.

Article 198's peremptory periods reflect a pre-determination that the best interest of the child requires terminating the biological father's parental rights without a hearing on parental fitness. *See Maxwell*, 434 So.2d at 379-80 (conclusive evidence that "parent has forfeited his right" by his conduct or that "exercise of the right would injuriously affect the child's welfare" was required to terminate unwed biological father's right to visitation); *Stanley*, 405 U.S. 657-58 (state's interest in caring for children is *de minimus* if the father is a fit parent).

In *B.G.S.*, the Louisiana Supreme Court found that the opportunity to present evidence at a hearing to determine the best interest of the child did not satisfy the requirements of due process because the interest of the biological father and the deprivation of his rights was not at issue in a best interest hearing. 556 So.2d at 555. Article 198 does not afford the biological father even the minimal process that a hearing on the best interest of the child would provide.

In the present case, Mr. Andrews has a private interest in bringing an avowal action that is affected by Article 198's preemption clause. As the current statute

---

[47] The legislative history of Article 198 and its stated purpose of protecting the "intact family" reveal the same underlying concern with legitimacy.

can be interpreted to deprive him of his interest after one year, without requiring that he receive notice of a child's birth, there is a risk of an erroneous deprivation. Due process protection of a man's inchoate right to a relationship with his child requires, at a minimum, that he be aware of his paternity, and that he be afforded some meaningful opportunity to exercise his right to develop that relationship. Article 198 grants sole discretion to the child's mother to determine whether the father has the opportunity to develop the relationship or even receive notice of his child's existence.

Finally, in my opinion, the State has not shown that it would be substantially more burdensome on the system to allow a father a hearing on the child's best interest, or at least notice of paternity, before foreclosing his right through peremption. Even if the definition of "bad faith deceives" is as we have determined in our majority opinion, the time and resources expended in litigating the mother's knowledge and motives would have been better spent determining whether the father acted reasonably, and in a timely fashion, in coming forward to accept responsibility for his child's care and seek a relationship with his child. Before the legislature implemented the peremptory periods, Louisiana courts afforded a biological father a hearing to determine whether he acted in a timely manner considering all relevant factors including the best interest of the child. *Putnam v. Mayeaux*, 645 So.2d 1223 (La. App. 1 Cir. 1994) (no prescriptive period; one year and three days was reasonable); *Geen v. Geen*, 666 So.2d 1192 (La. App. 3 Cir. 1995) (fifteen to nineteen months was reasonable); *Demery v. Housing Auth. Of New Orleans*, 689 So.2d 659 (La. App. 4 Cir. 1997), *T.D. v. M.M.M.*, 730 So.2d 873 (six years was not too long).

As to the claim that G.J.K.'s due process rights were violated, if the biological father has a constitutional interest in his opportunity to develop an emotional and psychological connection with his child, then the child has a

concomitant interest in the opportunity to know and develop a relationship with his biological father. However, at least facially, the child's rights to both the personal relationship and the legal benefits that accompany filiation to one's father are not affected by Article 198.

Civil Code Article 197 allows the child's action to establish filiation to his biological father, despite being filiated to his presumed father, ensuring that the child would receive all of the legal benefits filiation provides (*i.e.*, support, inheritance, wrongful death benefits). There is no time limitation on the child's ability to file the action unless the biological father has died. La. C.C. art. 197. *But see* Louisiana House of Representatives, Civil Law Committee (4/5/2004), H.B. 368 *available at* https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2004/apr/0405 _04_CL# (1:18:39-1:19:35-1:20:00). However, Louisiana Code of Civil Procedure art. 683 requires that the presumed father must agree to file the avowal action on behalf of the child until the child reaches the age of majority. As discussed above, the presumed father's interest may well be contrary to avowal of the biological father and inimical to the child's own interest, causing deprivation to the child of his due process rights. Therefore, as discussed above, Civil Code art. 198 risks violating the due process rights of both the biological father and the child.

As is becoming apparent, the most important right parents possess is the right to due process protection of their fundamental right to parent. Parents are entitled to a hearing on the issue of fitness before their parental rights may be terminated. *See, e.g.*, *Stanley*, 405 U.S. at 658. Article 198 risks a biological father's right to an opportunity to prove his willingness and fitness to parent in circumstances in which he may be unaware of his paternity or, for a legitimate reason, late in filing his action. The statute presumes that the biological father deserves to have his parental rights terminated one year after the birth of the child

unless he can affirmatively prove that the child's mother deceived him in bad faith as to his paternity.

When rights as important as these are at stake, a statutory scheme that deprives a biological father of all parental rights without a hearing as to his commitment to parental responsibilities or his fitness minimally places the biological father's right to due process at extreme risk.  As the United States Supreme Court found in *Stanley*,

> Procedure by presumption is always cheaper and easier than individualized determination.  But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child.  It therefore cannot stand.

405 U.S. at 656-57.

Again, I remain deeply concerned with Louisiana Civil Code Article 198's constitutionality.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **AUGUST 6, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 17-CA-625

## E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE FRANK A. BRINDISI (DISTRICT JUDGE)
ALLISON K. NESTOR (APPELLEE)
DESIREE M. VALENTI (APPELLANT)
THOMAS A. ROBICHAUX (APPELLANT)

LEONARD L. LEVENSON (APPELLEE)
SHARON L. ANDREWS (APPELLANT)
RAMONA G. FERNANDEZ (APPELLEE)

JACQUELINE F. MALONEY (APPELLEE)
STEPHANIE A. FRATELLO (APPELLANT)

## MAILED
HONORABLE JEFFREY M. LANDRY
(APPELLEE)
ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 NORTH 3RD STREET
6TH FLOOR, LIVINGSTON BUILDING
BATON ROUGE, LA 70802

ASHLEY FISHER  (APPELLEE)
ELIZABETH FOX  (APPELLEE)
LINDSAY DEAN  (APPELLEE)
STUDENT PRACTITIONER
STUART H. SMITH LAW CLINIC &
CENTER FOR SOCIAL JUSTICE
7214 ST. CHARLES AVENUE
NEW ORLEANS, LA 70118

TRACY G. SHEPPARD (APPELLEE)
ATTORNEY AT LAW
412 DOLHONDE STREET
GRETNA, LA 70053

DAVID J. SMITH, JR. (APPELLEE)
JEFFREY M. WALE (APPELLEE)
ASSISTANT ATTORNEY GENERALS
LOUISIANA DEPARTMENT OF JUSTICE
POST OFFICE BOX 94005
BATON ROUGE, LA 70804-9005

CHRISTIAN W. HELMKE (APPELLEE)
DONNA R. BARRIOS (APPELLEE)
ATTORNEYS AT LAW
424 GRAVIER STREET
NEW ORLEANS, LA 70130